# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

————————

No. 97-1859EM

————————

| | |
|---|---|
| Cecilia Lacks, | * |
| | * |
| Appellee, | * |
| | * On Appeal from the United |
| v. | * States District Court |
| | * for the Eastern District |
| | * of Missouri. |
| Ferguson Reorganized School | * |
| District R-2, | * |
| | * |
| Appellant. | * |

————————

Submitted:  January 12, 1998

Filed:  June 22, 1998

————————

Before RICHARD S. ARNOLD,[1] Chief Judge, WOLLMAN and HANSEN, Circuit
Judges.

————————

RICHARD S. ARNOLD, Chief Judge.


In this case Ferguson-Florissant Reorganized School District ("the school
board") appeals the District Court's grant of summary judgment in favor of the plaintiff,

————————

[1]The Hon. Richard S. Arnold stepped down as Chief Judge of the United States
Court of Appeals for the Eighth Circuit at the close of business on April 17, 1998.  He
has been succeeded by the Hon. Pasco M. Bowman II.

Cecilia Lacks, on Lacks's claim under Missouri law that her termination by the board was not supported by substantial evidence. The school board also appeals a jury verdict in favor of Lacks on First Amendment and race discrimination claims. We reverse and remand for the entry of judgment in favor of the defendant school district. We hold, among other things, that a school district does not violate the First Amendment when it disciplines a teacher for allowing students to use profanity repetitiously and egregiously in their written work.

I.

Cecilia Lacks began teaching at Berkeley Senior High School in the fall of 1992 after teaching at other schools in the same school district since 1972. Lacks taught English and journalism classes, and she sponsored the school newspaper. In October 1994, Lacks divided her junior English class into small groups and directed them to write short plays, which were to be performed for the other students in the class and videotaped. The plays written by the students contained profanity, including the repeated uses of the words "fuck," "shit," "ass," "bitch," and "nigger." When the plays were videotaped, these words were used more than 150 times in approximately forty minutes. Hearing Exhibits 12 and 13. Lacks later admitted that the plays contained an unusual amount of profanity, and one of her witnesses later described the use of profanity in the plays as "extreme," "disgusting," "upsetting," and "embarrassing." Hearing Tr. at 271, 277, 439. Lacks was aware of the content of the plays before they were performed, because she had previously reviewed at least one of the scripts and had attended rehearsals of the plays the day before. Hearing Tr. at 437. On October 10, the students performed their plays and were videotaped at the direction of Lacks. Two other school district employees were also present during the videotaping of the plays: Donna Clark, a part-time teacher, and Mike Minks, an audio-visual technician. Clark and Minks eventually received letters of reprimand from the school administration for allowing the students to use profanity. Hearing Tr. at 167, 233.

The following January, as a result of complaints by one of Lacks's students, the existence of the videotapes came to the attention of Vernon Mitchell, the principal of Berkeley High School. Mitchell initiated an inquiry into the matter, and he and two school district administrators met with Lacks and her union representative twice over the next two weeks. During the investigation, the administrators learned that as part of a poetry-writing exercise, Lacks had permitted a student to read aloud in a classroom two of his poems which contained profanity and graphic descriptions of oral sex. Hearing Tr. at 386-88, 596-97.

Following the investigation, Dr. Robert Fritz, the district superintendent, formally charged Lacks with "willful or persistent violation of and failure to obey [the school district's] policies" under Mo. Ann. Stat. § 168.114 (1991 & Supp. 1998). Appellant's App. at 901. Fritz alleged that Lacks violated several school board policies and recommended her termination by the school board. Lacks requested a hearing, and the school board heard testimony from Lacks and fifteen other witnesses over five evenings in early March 1995. The school board also examined numerous exhibits and viewed the videotaped performances of the students' plays. At the hearing, the school board narrowed its earlier allegations to one charge: violation of board policy 3043, which requires teachers to enforce the section of the Student Discipline Code which prohibits profanity.[2] On March 23, the board issued a decision which found that Lacks was

---

[2]The Ferguson-Florissant Student Discipline Code prohibits two types of student behavior. Under the Student Discipline Code, Type I behavior includes serious misconduct, such as drug use, theft, or the use of firearms or explosives, which may result in student suspension or expulsion. Type II behavior includes behavior "that is disorderly or unacceptable but does not violate Type I standards . . . ." Under the Code, Type II behavior includes profanity and obscene gestures, and a student who engages in Type II behavior is subject to a verbal reprimand, loss of class or school privileges, special work assignments, change of class schedule, or temporary separation from peers. Appellant's App. at 250-51. There are no written exceptions under the Student Discipline Code which permit students to engage in Type II behavior.

-3-

aware of the school board's policy preventing profanity, that she could have chosen teaching methods which prohibited profanity, and that her failure to do so constituted a "willful and persistent practice violative of Board policy to a degree that cannot be . . . tolerated." Appellant's App. at 905. Based on its findings, the school board terminated Lacks's teaching contract.

In May 1995, Lacks brought suit in a Missouri state court, seeking judicial review of the school board's decision under Mo. Ann. Stat. § 168.120 (1991 & Supp. 1998). She also alleged that the school board violated her due process rights under the United States and Missouri Constitutions, violated her rights under the First Amendment and 42 U.S.C. § 1983 (1994), and discriminated against her on the basis of race in violation of Missouri law and Title VII of the federal Civil Rights Act. The school board removed the entire case to the District Court pursuant to 28 U.S.C. § 1441 (1994). The District Court granted the school board's motion to dismiss Lacks's due process claims for failure to state a claim upon which relief could be granted, but it denied the school board's motion to dismiss Lacks's First Amendment claim. The District Court also entered partial summary judgment in favor of Lacks on her claim for review of the school board's termination of her teaching contract. See Lacks v. Ferguson Reorganized School District R-2, 936 F. Supp. 676 (E.D. Mo. 1996). In its order, the District Court held that Lacks did not willfully violate board policy 3043, because she believed that profanity was permitted in the context of creative expression in the classroom. Id. at 682-83. Accordingly, the District Court awarded Lacks reinstatement with back pay, attorneys' fees, and costs.

The parties proceeded to trial in November 1996 on Lacks's First Amendment and race discrimination claims. The school board moved for judgment as a matter of law at the close of Lacks's case and its own case, and the District Court denied the motion both times. The District Court submitted the case to the jury, which returned a verdict in favor of Lacks for $500,000 on the First Amendment claim and $250,000 on the race discrimination claim. The school board now appeals.

## II.

We can easily dispose of the school board's argument that the District Court improperly allowed the board to remove the case because it lacked jurisdiction to review the school board's decision under the Missouri Administrative Procedure Act. In City of Chicago v. International College of Surgeons, 118 S. Ct. 523 (1997), the Supreme Court held that a federal district court properly exercised jurisdiction over a case containing claims for on-the-record review of local administrative findings as well as claims that a local administrative action violated federal law. Id. at 530. The school board recognized in its brief, filed before the Supreme Court decided City of Chicago v. International College of Surgeons, that "[t]he case at bar is in a procedural posture identical to the case considered in International College of Surgeons." Appellant's Br. at 15. Accordingly, we hold that the District Court properly allowed the school board to remove this case.

## III.

### A.

Under Missouri law, when a school board terminates a contract with a teacher under Mo. Ann. Stat. § 168.114, including termination for the willful or persistent violation of a school board regulation, the teacher may appeal the school board's decision to a state circuit court and seek judicial review of the school board's decision. The court must affirm the decision of the school board unless the decision (1) violates a constitutional provision; (2) is made in excess of statutory authority or jurisdiction; (3) is unsupported by "competent and substantial evidence upon the whole record"; (4) is made for any other reason unauthorized by law; (5) is made upon unlawful procedure or without a fair trial; (6) is arbitrary, capricious or unreasonable; or (7) involves an abuse of discretion. Mo. Ann. Stat. § 536.140 (1988 & Supp. 1998). This scope of

review is limited. The reviewing court must affirm the school board if the board "reasonably could have reached the decision it did." Hudson v. Wellston School District, 796 S.W.2d 31, 33 (Mo. App. 1990). The court may not substitute its judgment of the evidence for that of the school board, and it must consider all evidence in the light most favorable to the decision of the board. Id. The determination of the credibility of the witnesses is a function of the school board, not the reviewing court. Ortbals v. Special School District, 762 S.W.2d 437, 439-40 (Mo. App. 1988) (citations omitted).

The District Court granted summary judgment in favor of Lacks because it found insufficient evidence in the record that Lacks "willfully or persistently" violated board policy 3043. Lacks, 936 F. Supp. at 680. The parties agree with the District Court that proof of "willful or persistent" violation is twofold: The school board must prove both an intent to act and an intent to violate or disobey a particular regulation. Lacks, 936 F. Supp. at 680 (citing Ortbals, 762 S.W.2d at 440). In other words, in order to prevail the school board must prove that Lacks violated the board policy prohibiting profanity, and that she knew that the board policy applied to the profanity used by her students. After a careful review of the evidence, we hold that the record contains sufficient evidence for the school board to have concluded that Lacks willfully violated board policy.

Lacks admitted that she allowed students to use profanity in the classroom in the context of performing the plays they had written and reading aloud the poems they had composed. Hearing Tr. at 386-88. At the hearing, and in her brief, Lacks defended this practice by arguing that she thought that the board's policy on profanity applied only to "student behavior" and not to students' creative assignments. Id. at 484-86. She also argued that her teaching method, which she describes as the "student-centered method" and which she explained at length at the hearing, required her to allow her students creative freedom, which included the use of profanity. Id. at 372-78. Lacks could not say with certainty that she would be able to teach at Berkeley High School

if her students were not given the freedom to use profanity in their creative activities. Id. at 560-64. As evidence that Lacks believed that the anti-profanity policy did not apply to students' creative assignments, the District Court noted that testimony at the hearing indicated some confusion within the school district as to whether reading aloud literature which contained profanity might violate the school board's prohibition on profanity. Lacks, 936 F. Supp. 682. For example, Larilyn Lawrence, a curriculum coordinator for language arts at the school district, believed that a videotaped production of a play with students using profanity could fall within acceptable course parameters. Hearing Tr. at 840-43. On the other hand, Barbara Davis, the assistant superintendent for curriculum instruction, testified that teachers in the school district should not allow students to read aloud profanity contained in literary works. Id. at 792.

The school board also heard testimony from Lacks's principal, Vernon Mitchell, that he told Lacks that profanity was not permitted in the school newspaper. Mitchell testified that he specifically spoke to Lacks in 1993 about profanity in the school newspaper, and told her that use of profanity in the newspaper was not allowed. Hearing Tr. at 172-73, 240. Mitchell said that he had reviewed a draft of the newspaper and was concerned that the students were including profanity in the paper by writing "S blank blank T" and "F blank blank K" rather than writing every letter of the profane words. Id. at 173, 234, 249. Mitchell testified that he discussed the use of profanity in the newspaper with Lacks "[t]wo or three times." Id. at 240. Mitchell also noted that signs posted in Lacks's classroom read "No Profanity." Id. at 250. When the board issued its opinion terminating Lacks's contract, it based its decision in part on its finding that Lacks had been warned about the use of profanity by Mitchell. Appellants' App. at 904.

Lacks claimed that Mitchell never warned her about the use of profanity in the newspaper. Hearing Tr. at 413. However, under Missouri law, assessing the credibility of witnesses is the function of the school board, not the reviewing court. See

Ortbals, 762 S.W.2d at 439-40. Because the school board heard testimony that Lacks was directly warned by the principal in her school that including "S blank blank T" and "F blank blank K" in the student newspaper violated the school board's profanity policy, the board could have reasonably found that Lacks knew that profanity was not allowed in students' creative activities. While Lacks did produce some evidence that confusion existed in the school district as to the profanity policy, and while she denied that she had been warned about it, we must read the record in the light most favorable to the school board's decision, together with all reasonable inferences. Hudson v. Wellston School District, 796 S.W.2d at 33.

The policy prohibiting profanity was explicit and contained no exceptions. It was not ambiguous. The board was free to find that Mitchell gave Lacks an express and particularized direction about the student newspaper. We think it was not unreasonable for the board to treat student writing for the newspaper and student writing for the class as alike. Isolated instances of profanity had been overlooked or tolerated in the past, but what went on in Lacks's classroom went far beyond the reading aloud of a novel containing the occasional "damn." The board might have chosen a lesser form of discipline, especially in view of Lacks's long and devoted service. It was not required to do so by law. We hold that the board's decision was reasonable and supported by substantial evidence on the record as a whole. The judgment in the plaintiff's favor on this claim must be reversed.

B.

When the jury returned a verdict in favor of Lacks on her First Amendment claim, it provided answers to two interrogatories posed by the District Court's instructions. Under the District Court's instructions, answering "no" to either of the interrogatories allowed Lacks to prevail on the First Amendment claim. With respect to the first interrogatory -- "Did [Lacks] have reasonable notice that allowing students to use profanity in their creative writing was prohibited?" -- the jury answered "no."

With respect to the second interrogatory -- "Did defendant school district have a legitimate academic interest in prohibiting profanity by students in their creative writing, regardless of any other competing interests?" -- the jury also answered "no." Appellant's App. at 341. The District Court subsequently entered judgment in favor of Lacks with respect to her First Amendment claim. We reverse and hold, as a matter of law, that the answer to both of those questions was "yes."

Lacks argued at trial and on appeal that she was acting as a facilitator for her students' speech, and that, under First Amendment law, she cannot be punished for not prohibiting her students' use of profanity unless she was provided with reasonable notice that profanity was prohibited in students' creative exercises, and unless the prohibition on profanity in creative activity served a legitimate academic interest. At least one court has held that, under the First Amendment, a school district must provide a teacher with notice as to what types of expression are prohibited in a classroom before it holds the teacher responsible for failing to limit that type of expression. See Ward v. Hickey, 996 F.2d 448, 452 (1st Cir. 1993) (citing Keyishian v. Board of Regents, 385 U.S. 589 (1967)). We are satisfied that Lacks was provided with enough notice by the school board that profanity was not to be allowed in her classroom, whether in the context of a creative exercise or not. Lacks testified at trial that she understood that, under her contract with the school district, she was required to enforce the Student Discipline Code, and she testified that she was familiar with the rules and policies of the school board. Trial Tr. at 562-63. The Student Discipline Code clearly prohibits profanity and obscene gestures, and it contains no exception for creative activities. Appellant's App. at 251. Moreover, Lacks's principal, Vernon Mitchell, testified at trial, as he did at the school board hearing, that he informed Lacks that the use of profanity by the students was not permitted in the student newspaper, one form of creative activity. Mitchell told Lacks: "There is no way I would allow profanity in the newspaper." Trial Tr. at 1412.

In fact, Lacks received more notice than has been required in other cases. In Bethel School District No. 403 v. Fraser, 478 U.S. 675 (1986), a student was disciplined for using sexually suggestive language in a speech before a high school assembly. Before the student gave the speech, he told some of his teachers what he was going to say, and he was told that the speech was "inappropriate and that he probably should not deliver it" and that giving the speech could have "severe consequences." Id. at 678. The Court rejected the student's argument that his due process rights had been violated because he had not received sufficient notice that delivery of the speech would result in discipline: "Given the school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, the school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions." Id. at 686. In the present case, not only did Lacks admit that she was familiar with the school district's disciplinary rules and understood her obligation to enforce them, her principal also testified that he told her that the rules applied to one form of student creative activity. Therefore, as a matter of law, Lacks had sufficient notice that under the board's rules, she was not to permit profanity in her classroom. Perhaps the jury did not believe the principal's testimony about the warning he gave Lacks. Even so, the policy against profanity was explicit. Lacks well knew what the plays were like before she allowed the students to perform them. In acting as she did, she took the risk that the board would enforce the policy as written. Under the circumstances, the notice given was fair and constitutionally sufficient.

We also hold, as a matter of law, that the school board had a legitimate academic interest in prohibiting profanity by students in their creative writing. The Supreme Court has written that public education " 'must inculcate the habits and manner of civility as values in themselves conducive to happiness and as indispensable to the practice of self-government in the community and the nation.' " Fraser, 478 U.S. at 681 (quoting C. Beard & M. Beard, New Basic History of the United States 228 (1968)). While students in public schools do not "shed their constitutional rights to

-10-

freedom of speech or expression at the schoolhouse gate," <u>Tinker v. Des Moines Independent Community School District</u>, 393 U.S. 503, 506 (1969), students' First Amendment rights "in schools and classrooms must be balanced against the society's countervailing interest in teaching students the boundaries of socially appropriate behavior." <u>Fraser</u>, 478 U.S. at 681. Accordingly, the Supreme Court has held that "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." <u>Hazelwood School District v. Kuhlmeier</u>, 484 U.S. 260, 273 (1988).

A flat prohibition on profanity in the classroom is reasonably related to the legitimate pedagogical concern of promoting generally acceptable social standards. The Supreme Court has told us that "schools must teach by example the shared values of a civilized social order." <u>Fraser</u>, 478 U.S. at 683. The school board itself, in its opinion terminating Lacks's employment with the school district, wrote that the purpose of the board's disciplinary policies is "to establish, to foster, and to reflect the norms and standards of the community its serves." Appellant's App. at 903. Allowing one student to call another a "fucking bitch" and a "whore" in front of the rest of the class, and allowing a student to read aloud a poem that describes sexual encounters in the most graphic detail, as the students did in Lacks's classroom, hardly promotes these shared social standards. We consider the matter too plain for argument.

As a matter of law, the school board had the right to establish and require the enforcement of a rule which prohibits classroom profanity in any context, and it provided Lacks with enough notice of its disciplinary policies. Therefore, the judgment in the plaintiff's favor on her First Amendment claim is reversed.

C.

At trial, Lacks set out to prove her race discrimination case by "direct" evidence of discrimination under Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), rather than the indirect, burden-shifting method of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Appellee's Br. at 51-52. The jury found that Lacks had proved by a preponderance of the evidence that race was a motivating factor in the school board's decision to terminate her, and that the school board did not prove by a preponderance of the evidence that it would have discharged Lacks regardless of her race. We reverse, and hold as a matter of law that race was not a motivating factor in the school board's decision to terminate Lacks. In reaching that conclusion, we are mindful that the evidence must be viewed in the light most favorable to the jury's verdict, and that all reasonable inferences in support of the verdict must be allowed.

Lacks points to a statement made by Vernon Mitchell, her principal and supervisor. Mitchell admitted that when he saw the videotape with the students performing their plays, his reaction was that it was "black students acting a fool and white folks videotaping it." Trial Tr. at 1392. Lacks also elicited testimony from another teacher at Berkeley High School that in the past Mitchell had displayed signs of hostility toward white teachers at Berkeley because Mitchell believed that some white teachers did not care about the students. Id. at 1316. And Lacks produced some evidence which arguably showed that Dr. John Wright, an assistant superintendent for personnel, viewed the videotaping incident in racial terms. Id. at 1656. Lacks is white; Mitchell, Wright, and the students are black.

However, Mitchell and Wright did not make the decision to terminate Lacks; that decision was made by the school board. Trial Tr. at 1906-07, 2013. Lacks responds to this problem by arguing that the school board was influenced by the bias of the administrators, and that the board consequently served as the conduit, or "cat's paw," of the racial animus of the school administration. See Kientzy v. McDonnell Douglas

<u>Corp.</u>, 990 F.2d 1051, 1057-58 (8th Cir. 1993); <u>Shager v. Upjohn Co.</u>, 913 F.2d 398, 405 (7th Cir. 1990). But Lacks produced no evidence that the school board deferred to the opinion or judgment of Mitchell or Wright in making its determination. At the board's hearing, neither Mitchell nor Wright recommended that the board terminate Lacks. Trial Tr. at 1418, 1907. Patrick Boyle, a school board member, testified that no members of the administration were present during the board's deliberations, and that no administrator suggested to the board what the decision should be. <u>Id.</u> at 2013-14. Boyle said that all board members agreed that Lacks had violated school policy, and that most of the deliberations centered on the level of discipline she should receive. <u>Id.</u> at 2012. Michael Hirsch, another school board member, testified that during its deliberations, the school board never discussed any alleged racial discrimination against Lacks by school administrators. <u>Id.</u> at 1905. Hirsch said, "We sat and we reviewed the evidence; talked about the evidence; how it related to board policy. We listened to the arguments and discussed the arguments on both sides." <u>Id.</u> at 1906. The evidence in this case unequivocally shows that the board made an independent determination as to whether Lacks should be terminated and did not serve merely as a conduit for the desires of school administrators. Lacks's "cat's paw" theory must therefore fail.

Lacks offers one piece of evidence which allegedly shows direct racial bias on the part of the school board: a four-page press release issued by the board after it terminated Lacks's teaching contract. The press release reads in part:

> Teachers set the tone and direction for class assignments and projects, and all classroom activities should be able to stand the test of public scrutiny. The video produced in Ms. Lacks' class demonstrates a serious and extreme lack of direction from the teacher. Teachers do not have the right to abdicate their responsibility to set standards under the guise of creativity. The content of the video is a violation of our black community; it is a violation of our white community; it is a violation of the values within our community and it is a violation of the ethical teaching

standards practiced by all educational professionals. Most importantly, it is a violation of the students in the class. It assumes that all students in the class operate from the standard of behavior portrayed on the video. That assumption is wrong, and it is what led to the student complaints that brought the video to the administration's attention.

Appellant's App. at 1008-09. Lacks argues that the references to "white community" and "black community" provide direct evidence that the board "had race on its mind" when it fired Lacks. Appellee's Br. at 59. That proposition is questionable, especially given that Leslie Hogshead, the president of the school board, who signed the statement, testified that she did not believe that Lacks's case involved racial issues. Trial Tr. at 1496. Moreover, having race on one's mind is not the same thing as acting because of race. At any rate, the single reference in the school board's press release is not sufficient to sustain the jury verdict on the race discrimination claims. Because Lacks has produced insufficient evidence that the school board's decision to terminate her was motivated by race, the judgment in Lacks's favor on her race discrimination claims cannot stand. On this record, the inference that the school board acted because of Lacks's race is wholly unreasonable. In our view, the extreme nature of the language used and the exhaustive hearing given Lacks by the board leave no room for anyone reasonably to conclude that Lacks was disciplined because of her race.

The judgment of the District Court is reversed, and the cause remanded with directions to dismiss the complaint with prejudice.

It is so ordered.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-14-