Cecilia LACKS, Appellee,

v.

FERGUSON REORGANIZED SCHOOL DISTRICT R–2, Appellant.

No. 97–1859.

United States Court of Appeals, Eighth Circuit.

Sept. 17, 1998.

---

Order Denying Petition for Rehearing and Suggestion for Rehearing En Banc

The suggestion for rehearing en banc is denied. Judge McMillian and Judge Morris Sheppard Arnold would grant the suggestion. The petition for rehearing by the panel is also denied.

McMILLIAN, Circuit Judge, dissenting.

I dissent from the court's denial of the petition for rehearing en banc. I believe that consideration by the full court is necessary to maintain uniformity of our decisions and, more importantly, because this case involves issues of exceptional importance. *See* Fed. R.App.P. 35(a).

This case is not about whether students should or should not be permitted to use profanity in their creative writing assignments or anywhere else in school; indeed, I have no quarrel with a school policy that clearly and strictly prohibits students from using profanity in all school-related activities. Nor is there any question that Lacks allowed some of her students to use profanity in their creative writing assignments "repetitiously and egregiously," as the panel states. *Lacks v. Ferguson Reorganized Sch. Dist. R–2*, 147 F.3d 718, 719 (8th Cir.1998) (*Lacks*). The issue in this case, however, concerns the

constitutionality of terminating a public high school teacher—one who had been teaching for over twenty years—for allowing students to use profanity in their creative writing assignments, where that teacher was not on notice that the school's profanity policy, as stated in the Student Discipline Code, was meant to cover student creative writing assignments.

The factual question of whether Lacks was notified that the school policy prohibiting profanity covered student creative writing assignments was submitted to the jury in an interrogatory. The interrogatory asked: "Did [Lacks] have reasonable notice that allowing students to use profanity in their creative writing was prohibited?" *Id.* at 723. The jury answered "no." *Id.* That factual finding by the jury must be reviewed by this court under a "highly deferential standard." *Crittenden v. Tri–State Thermo King, Inc.*, 108 F.3d 165, 166 (8th Cir.1997). More specifically, in reviewing the jury's finding that Lacks did not receive reasonable notice of the applicability of the school policy, this court must "resolve all conflicts in favor of [Lacks], giving [her] the benefit of all reasonable inferences and assuming as true all facts supporting [Lacks] which the evidence tended to prove." *Id.; see also Becker v. United States*, 968 F.2d 691, 694 (8th Cir.1992) ("Our standard for review of a jury finding is a deferential one: we must affirm the jury's verdict 'if, viewing the evidence in the light must favorable to appellees, reasonable persons could differ as to the proper conclusion.' ") (citing *Rademaker v. Nebraska*, 906 F.2d 1309, 1311 (8th Cir.1990)).

The panel in this case failed to follow our well-established standard of review. The panel reversed the jury's factual finding that Lacks was not given reasonable notice of the applicability of the profanity policy by simply declaring, "as a matter of law," that the answer to the interrogatory "was 'yes.' " *Lacks* 147 F.3d at 723. In the interest of maintaining uniformity of our decisions, the panel opinion should be vacated. A jury finding is no less entitled to deference because it leads to an unpopular result. Moreover, the panel opinion's underlying reasoning is flawed for several reasons.

First, the panel opinion cites the fact that Lacks stated at trial that she knew she was required to enforce the Student Discipline Code and that she was familiar with the written rules and policies of the school board. *Id.* Lacks's statement, viewed in isolation, certainly favors the school district's position, but it is only a small portion of Lacks's trial testimony. Lacks was on the witness stand for more than two days during the two-week trial. She provided ample testimony from which it could be inferred that she was not reasonably notified that allowing students to use profanity in their creative writing assignments was prohibited, notwithstanding her knowledge of her duty to enforce the Student Discipline Code and her familiarity with the school board's written rules and policies. The assessment of Lacks's credibility was a function of the jury, not the court of appeals. *See Greaser v. State of Missouri, Dep't of Corrections*, 145 F.3d 979, 983 (8th Cir.1998) (noting that determination of witness credibility is "task for the jury to perform") (citing *Manatt v. Union Pac. R.R. Co.*, 122 F.3d 514, 518 (8th Cir.1997) ("it was up to the jury to assess [the witness's] credibility"), *cert. denied,* —— U.S. ——, 118 S.Ct. 697, 139 L.Ed.2d 641 (1998)).

Lacks also introduced anecdotal evidence at trial which showed that the use of profanity in student creative works had previously been allowed by the school without punishment to the supervising teacher or the students involved. For example, during the trial testimony of school principal Vernon Mitchell, Lacks's counsel questioned him about a play entitled "How You Living," which was written and performed by Berkeley High School students under the supervision of a teacher named Sharita Kyles. Mitchell admitted that this play was performed one evening in the school auditorium, that it was open to the community, and that he was in the audience during the performance. Portions of a videotape of that production were shown to the jury during Mitchell's testimony. While watching the videotape, Mitchell conceded that the play had profanity and other inappropriate content. For example, he admitted that there were lines such as: "I tried to keep her back

but she was pulling on my thing"; "I'll blow your damn head off"; and "Man, damn leave me the hell alone." In light of these admissions, Lacks's attorney asked Mitchell if he had seen a student play containing profanity before he testified at Lacks's school board hearing. Mitchell answered "yes." He also admitted that, when the play was over, he thanked the students and Sharita Kyles for the production and, thereafter, did not take any action against Kyles for violating the Student Discipline Code. Trial transcript (Vol.VII) at 1373–1386.

While the "How You Living" play was performed at Berkeley High School around 1992, shortly before Lacks began teaching there, the evidence certainly supports the conclusion that teachers at the school were not reasonably on notice that they would be punished if a student were to write or perform a play containing profanity. Moreover, while it is abundantly clear that the profanity in Lacks's students' works was worse than the profanity in the play "How You Living," that is not the issue; the issue is whether or not the jury reasonably could have concluded that "[Lacks] [did not] have reasonable notice that allowing students to use profanity in their creative writing was prohibited," based on the evidence introduced at trial viewed in the light most favorable to Lacks.

The panel opinion also relies on the fact that Mitchell testified at trial that he informed Lacks that the use of profanity by the students was not permitted in the student newspaper, one area of student creative writing. The panel opinion states: "Lacks's principal, Vernon Mitchell, testified at trial, as he did at the school board hearing, that he informed Lacks that the use of profanity by the students was not permitted in the student newspaper, one form of creative activi-

ty. Mitchell told Lacks: 'There is no way I would allow profanity in the newspaper.'[1]" *Lacks*, 147 F.3d at 723 (citing Trial transcript at 1412).

Notably, in reversing the district court's summary judgment disposition of Lacks's separate state law claim, which challenged the school board's decision, the panel opined:

> Because the school board heard testimony that Lacks was directly warned by the principal in her school that including "S blank blank T" and "F blank blank K" in the student newspaper violated the school board's profanity policy, the board could have reasonably found that Lacks knew that profanity was not allowed in students' creative activities. While Lacks did produce some evidence that confusion existed in the school district as to the profanity policy, and while she denied that she had been warned about it, we must read the record in the light most favorable to the school board's decision, together with all reasonable inferences.[2]

*Id.* at 722.

It can equally be said that, while the jury heard testimony that Lacks was directly warned by Mitchell that profanity in the *student newspaper* violated the school board's profanity policy, the jury reasonably could have found that Lacks was not given reasonable notice that profanity in *student creative writing assignments* violated the policy. A school newspaper is not the same as classroom creative writing assignments. Because Mitchell's warning addressed a *publication* which held itself out as a *newspaper* and was identified with the *school as a whole*, the jury reasonably could have concluded that Lacks reasonably assumed that Mitchell's position vis-a-vis the student newspaper

---

1. Actually, the quote attributed to Mitchell in the panel opinion is a statement that was made by *Lacks to Mitchell*, not vice versa, during a transcribed meeting that took place on January 25, 1995. *See* Trial transcript (Vol.VII) at 1411–1412.

2. Notably, while the panel opinion omits any mention of the deferential standard of review that the court of appeals was required to apply in reversing the jury's factual finding on Lacks's First Amendment claim, the panel opinion clearly describes the virtually identical standard of

review that the district court was required to apply in setting aside the school board's decision. *See Lacks v. Ferguson Reorganized Sch. Dist. R–2*, 147 F.3d 718, 721 (8th Cir.1998) ("The court may not substitute its judgment of the evidence for that of the school board, and it must consider all evidence in the light most favorable to the decision of the board. The determination of credibility of the witnesses is a function of the school board, not the reviewing court.") (citations omitted).

was not based upon the Student Discipline Code. Thus, the mere fact that Mitchell instructed Lacks not to allow students to use profanity in the student newspaper does not prove, "as a matter of law," that Lacks had sufficient notice that profanity was prohibited in her classroom creative writing assignments. *See id.* at 723–24.

Finally, the panel opinion reasons:

The Student Discipline Code clearly prohibits profanity and obscene gestures, and it contains no exception for creative activities.

. . . .

*[T]he policy against profanity was explicit.* Lacks well knew what the plays were like before she allowed the students to perform them. In acting as she did, she took the risk that the board would enforce the policy as written.

*Id.* (emphasis added). By this, the panel could mean only one thing, given the context—that the policy "as written" was "explicit" in prohibiting the use of profanity *in creative writing assignments.* I disagree.

School board policy 3043 requires teachers to enforce the Student Discipline Code, which in turn prohibits profanity and obscene gestures, among numerous other forms of "prohibited behavior." *Id.* at 720 & n. 2. Nowhere does the policy explicitly state that profanity is prohibited in student creative works, and nowhere does it state that creative writing assignments qualify as "behavior." In other words, the policy was not *explicit* with respect to classroom creative writing assignments. Moreover, the jury reasonably could have concluded, under the circumstances of this case, that a teacher could reasonably assume that the language a student used in a creative writing assignment was not considered "behavior" governed by the Student Discipline Code, particularly in light of evidence that profanity in other student creative works—including one student-written play—was apparently condoned. In other words, the jury reasonably could have concluded that it also was not *implicit* in the Student Discipline Code that the profanity prohibition applied to creative writing assignments. That reasonable inference by the jury could not be overturned by the court of

appeals under our highly deferential standard of review. *See Crittenden v. Tri–State Thermo King, Inc.,* 108 F.3d at 166.

I also believe that en banc review is justified in this case because it involves issues of exceptional importance. The panel highlights the fact that offensive and profane words were used more than 150 times in approximately forty minutes of the student-written plays. The panel also points to the fact that "as part of a poetry-writing exercise, Lacks had permitted a student to read aloud in a classroom two of his poems which contained profanity and graphic descriptions of oral sex." *Id.* at 720 (citing [School Board] Hearing tr. at 386–88, 596–97). Of course, when these facts are viewed in isolation, one might wonder how suppressing or censoring such profanity could raise any First Amendment or educational issues of exceptional importance. Again, these facts, standing alone, present only a one-sided, fractional portion of the evidence. The jury was presented with a much bigger picture. For example, Lacks testified at length about the two poems mentioned above and the context in which they were read to the class. Her testimony revealed that those two poems—vulgar and shocking as they were— were the first utterances in the class by a boy named Reginald, who previously had refused to participate in class and had repeatedly been sent to the principal's office because he did nothing but put his head on his desk during class. While Lacks does not deny that she allowed Reginald to read those two poems aloud in class, she also testified that no one was aware of their content before he read them. Trial transcript (Vol.II) at 369. More importantly, however, she explained that, after he wrote and read aloud those two poems, Reginald went on to write several more for her class, the last of which, entitled "Alone," won academic awards. These facts were entirely ignored in the panel opinion (as they apparently were ignored by the school board).

Lack's trial testimony regarding Reginald's story is set forth below. I urge that this part of the record be fully and thoughtfully considered.

Q. I would like to show you, Cissy, what's been marked as Exhibit 18, and ask if you can identify this document?

A. Yes.

Q. What is it?

A. This document is a series of poems that I showed to the administrators in my District that was done by one of my students, Reginald McNeary, when he was in ninth grade.

Q. And when was that?

A. That was in 1992.[3]

Q. At the Berkeley High School?

A. Yes.

Q. And these poems were done in which class?

A. These poems were done in the ninth grade English class.

Q. What do they illustrate, Cissy?

. . . .

A. They illustrate how a student can grow in a very short period of time using the student-centered teaching method. They illustrate that a student can learn a lot of techniques in a very short time if he or she cares about what he is doing, and they show that what a student says in the beginning is not at all the way a student might want to express him or herself, but it's what they start with because they may not have had the experience to do or say anything else.

Q. And you said you showed these poems to your administrators?

A. Yes.

Q. When did you do that?

A. I did that in a meeting that I had with them on January 25th.

Q. 1995?

A. 1995.

Q. And that was after you were suspended?

A. Correct.

Q. All right, can you start with the first poem on the top there and explain to us the significance of this poem in that learning process that you just described?

A. This poem that I'm going to read is the last poem that Reginald wrote.

Q. The last poem he wrote in what period of time?

A. In three weeks.

Q. This was a three-week poetry unit?

A. Yes.

Q. In ninth grade English?

A. Yes.

Q. First of all, tell us the story of Reginald. When he came into your class, what did you observe about him?

A. Reginald came into my class and he wanted to do absolutely nothing but put his head on his desk in the back of the room. He did not talk to anyone. He did not talk to me. He wouldn't do assignments. I would send him to the guidance office, he would throw away the sheets of paper. I would send him to the principal, I would get a note back saying that I should send *him during my class but he wouldn't* go. I continued to send—nothing worked for Reginald. He was totally silent, totally disengaged, totally disconnected from me, from school, and he also, I learned later, because I asked about him, had had a very difficult—

MR. SUSMAN: Objection, hearsay.

THE COURT: That will be sustained.

Q. Did Reginald have any observable problems in learning, to your knowledge?

A. Yes.

Q. What were they?

A. He seemed to have a very difficult time talking to people or looking at them. I saw him write something once and he seemed to have an eye hand coordination problem in terms of writing.

Q. All right, did he later stop putting his head down in the class?

A. Yes.

---

**3.** *It is worth noting that the events involving Reginald occurred three years before the events* concerning the student plays, which led to the school board's termination of Lacks.

Q. About when did that occur?

A. When we started doing the poetry writing.

Q. How did you organize physically the classroom when you began the poetry writing?

A. The class was in a circle so we could talk to each other and share work.

Q. And did Reginald sit in the circle?

A. No.

Q. Where did he sit?

A. He sat in the back of the room with his head on his desk.

Q. What did the other students do?

A. They told me that if they had to sit in the circle, Reginald would have to sit in the circle, I should force Reginald into the circle.

Q. What did you tell them?

A. I told them there was no way I could force Reginald in the circle short of picking up the desk, but that they could get him in the circle by doing things so interesting to him that he would be jealous and come into the circle.

Q. Did that happen?

A. It did.

Q. How soon after did it happen?

A. Two days after we started doing things in poetry, he started moving into the circle.

Q. Okay, and this first poem that is listed on Exhibit 18 was written you say about three weeks after he moved into the circle?

A. Yes.

Q. Okay, would you read it for us, please?

A. Sure. It's called "Alone."

I'm all alone in this world today.
No one to laugh with, no one to play.
It's been like that since the age of three.
No one to love care or hold me.
I guess that's why I'm the way I am.
No one loved me so I don't give a damn.
No one to pick me up when I fall.
No one to measure growth or how tall.
Alone, how it hurts inside.
If I were to die, no one would cry.
I never gave a damn about any other.
I love my shoes more than I love my mother.
You might think I'm the devil or call me Satan.
I have no love, I'm so full of hating.
I guess that's why I have low self-esteem.
The only time I show love is in my dreams.

. . . .

Q. Let me ask you Cissy, did this poem win any awards?

A. This poem, a somewhat corrected one won awards. This poem won the first place in the poetry contest at Berkeley High School, and then I believe it also won the district-wide poetry contest in a corrected version.

Q. Corrected in what way?

A. Corrected in the grammar, and corrected a bit in the way the stanzas are organized.

Q. Did Reginald agree to enter the poem in the contest?

A. Yes.

Q. Did he read this poem in class?

A. Yes.

Q. And you said you videotaped it?

A. Yes.

Q. Why did you do that?

A. At the end of the poetry unit when people have decided what they wanted to share with people, in this particular instance for poetry, we agree to tape them and then use them again in other classes, so each year they can see what students did the year before.

Q. Okay, and then can you explain to us the process that you went through with Reginald to get him to this award-winning poem?

A. Well, Reginald heard the things that we were talking about in terms of writing, and the first exercise I believe that he saw, a tape by Quincey Troupe talking about poetry writing, and Reginald wrote a poetry exercise for us

when we were reading out loud in the class, and he asked if he could read it out loud. It was the first time Reginald said anything in the class to any of us.

Q. Okay, would you like to show us what he did at that point?

A. Uh-huh.

Q. At the beginning?

A. I'm sorry, what do you mean, show it? Are you going to put it up?

Q. First of all, Exhibit 18, could you turn to the first poems that you just mentioned?

A. Okay. There is a poem called Hard Core Gangsta Pimp.

Q. And the second poem?

A. It's called Click.

Q. Let's see if I can get that. This Hard Core Gangsta Pimp poem?

A. Uh-huh.

Q. Is that the first poem he wrote in poetry class?

A. Yes.

Q. And would you agree there is a great deal of street language in there?

A. Yes.

Q. Profanity?

A. Yes.

Q. The second poem as well, the second poem called Click, the name of this poem is Click?

A. Uh-huh.

Q. Same thing?

A. Yeah.

Q. How did this poem come to be read to the class?

A. When we were doing the poetry exercises, we're just experimenting and nobody knows what anybody else has written, but when asked if they would like to share it, Reginald said that he would like to share what he had written.

Q. So he stood up and read it?

A. Yes.

Q. What did you say to him after he read these poems to the class?

A. Well, I was a little taken aback because it was also read with a lot of anger, and I told him in the class that I thought that his writing had a lot of anger in it, and that sometimes you can use anger to write extremely effective poems, and that he should listen to what we were doing in the rest of the classes when we talk about technique and process, and see if he could use some of that technique to express his anger in other ways.

Q. You did not criticize him for the street language in here?

A. No.

Q. Why not?

A. I would have—I was so pleased that Reginald did something, that he made an effort to talk, it was the first time he shared anything with anybody and did anything at all in the class, I was not going to shut him down, I was going to take that and work with it. It was something, finally I had something that he had done that I could work with, and the class could see him somewhat as part of the class and begin to respond to him. I thought it was a good moment in teaching.

Q. Did he write any poems immediately after those two?

A. Yes.

Q. Can you tell us what the next poem was in the series?

A. The next poem was called "Hate."

Q. When did he write Hate in relation to those first poems?

A. I think probably about a week and a half later.

Q. Okay?

A. Week later.

Q. Could you read "Hate" for us?

A. There is so much hate in the world today.

We are so busy hating we don't even pray.

Some whites hate blacks and some Germans hate Jews.

But they are wrong because no one can choose.

How dark or bright or fat or light people are to be.

If it was up to me I would love all my brothers, white, Jews or any other.

For Christmas instead of begging for jewelry, instead I'm going to pray for peace.

Q. Did you see any progress then between those first poems and this one?

A. Yeah, Reginald was beginning to use all techniques and styles we had talked about. He had opened up. He was beginning to talk about the feelings that he had, but in a way, I think, that he thought other people would listen to him and that was what he now thought was effective poetry.

Q. Did he write any other poem in that three week period of time?

A. Yes.

Q. What was the next poem he wrote?

A. He wrote a poem called "Why."

Q. And is there a date on this poem?

A. December 8th, 1992.

Q. Could you read "Why" for us?

A. Why.

Why do they stare at me when I'm [maxin']?

Is it 'cus I'm not the color that they are [axin'].

They whisper in silence.

I guess they think I'll cuss.

Violence, why, why couldn't God make us one color

Instead of black and white, and many others.

Why, why when you look at me you look in fear

When I have never beat you up or made you shed a tear.

Why can't we all just get along living in harmony.

Is that too wrong?

My sisters are labeled hooker and whore bangin',

And they have got my brothers dope and gangbangin'.

Why are my people living in poverty and the rich don't care how they be?

Now I know this is the worst poetry you [ever heard] but it comes from the heart. I wrote every word.

Q. Did you see any progress here?

A. I saw incredible progress. He is starting to use a certain style now and a rhythm to his writing, and it's real clear that he also has a position and he wants other people to know what it is and when he read it he told us what this poem came from.

Q. And then the last poem in the serious was the "alone" poem you read to us.

A. The last poem was the "Alone" poem.

Q. And how would you evaluate "Alone" as a piece of poetry?

A. I think that the person who wrote this poem is not a student poet but a poet. I think he is like Langston Hughes. He has an incredible way with words, and it makes people cry, in class, or just be so moved by what he is saying the doing, it's, you know, it's really amazing as a poem.

Q. Who chose his poem to win the district-wide poetry contest?

A. I'm not sure. I didn't. There were judges in the District who did.

Q. And by the way, the poem "Alone" which won the district-wide poetry contest, does that have any street language in it?

A. Yes, it does.

Q. I never gave a damn about any other?

A. Uh-huh, twice.

Q. Considerably less than that what Reginald included in his first two poems, would you agree?

A. Yes.

Q. And how do you explain that progress?

A. Well, to me I see it all the time, that once a student opens up and starts expressing himself or herself and then learns the process or the techniques and they hear people listening to them, they just want to begin to change what they are doing, so it's quite, it just seems to me it is a quite

natural learning process. It's part of the student-centered method.

Q. You also talked to us about peer critique, and I'm interested to know how did the class respond to Reginald's first two poems?

. . . .

Q. Did the class respond to Reginald's first two poems?

A. The class as I recall was taken aback. They just listened, but at the same time said, "Reginald, good, you talked," that's what I remember. "Reginald, you said something."

Q. Okay, and how did they react to the poem "Alone"?

A. They actually cheered and clapped for him when he read it.

. . . .

Q. Okay. You told us earlier that you took these poems to the administrators to explain to them your teaching process in January of '95 after you had been suspended. Did you take all the poems to them?

A. Yes.

Q. Did you explain to them as you explained to us today the teaching process?

A. Yes.

Q. Who did you explain this to?

A. I explained it to John Wright, Vernon Mitchell and Barbara Davis.

Q. Now, you went to the Board termination hearing regarding your termination, is that correct?

A. Yes.

Q. And the District included a couple of Reginald's poems in its evidence against you, didn't it?

A. Yes.

Q. How did they come to have these poems?

A. I brought them all five of these poems, that's how they came to have them.

Q. Did the administrators show the Board Reginald's award-winning poem?

A. No.

Q. What did you think about that?

A. I was so discouraged, I didn't even know what teaching was about any more. They showed the first two poems that Reginald wrote and didn't show anything else, somehow seemed to have lost or forgotten all the other poems. Very discouraging for a teacher and also for the student who had written the poems.

*Id.* at 360–76.

The school district now argues that "[p]etitions for rehearing or hearing en banc should not be granted when the resolution of a case affects only the parties immediate to the action." Response to Suggestion for Rehearing En Banc at 1 (citing *Schwieger v. Iowa Beef Processors, Inc.,* 816 F.2d 1217, 1219 (8th Cir.1987)). The outcome of this appeal does not affect only the parties to this action. It affects all innovative and well-meaning teachers like Lacks and students in need like Reginald. When good educators are scared away or driven from our schools because they cannot trust the system to treat them honestly and fairly, we are all affected, most especially our children. As the Supreme Court declared over thirty years ago,

[o]ur Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom. "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." The classroom is peculiarly the "marketplace of ideas." ... "... No one should underestimate the vital role in a democracy that is played by those who guide and train our youth."

We emphasize once again that "[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms;" ... "[f]or standard of permissible statutory vagueness are strict in the area of free expression. *** Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow

specificity." ... When one must guess what conduct or utterance may lose him his position, one necessarily will 'steer far wider of the unlawful zone ***." ... For the "[t]hreat of sanctions may deter *** almost as potently as the actual application of sanctions." ... The danger of that chilling effect upon the exercise of vital First Amendment rights must be guarded against by sensitive tools which clearly inform teachers what is being proscribed. *Keyishian v. Board of Regents,* 385 U.S. 589, 603–04, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) (citations omitted).

As I indicated at the outset, I am not condoning the use of profanity in our schools or every aspect of Lacks's teaching methodology. But the jury found in this case, based upon *all* the evidence and their assessments of credibility, that Lacks was not given reasonable notice that profanity was prohibited in her creative writing assignments. If she had been given such notice, this whole matter could have been avoided. In this day and age, while our children are being exposed to the worst aspects of society through the media, entertainment, and sometimes even in their own homes, we expect public school teachers to erase the effects of that environment and make even the most uninspired children learn and achieve. Meanwhile, we require our teachers to pick their way through a mine field of competing and conflicting expectations, and changing and elusive legal standards. This case stands for the proposition that, for all her hard work and devotion to *all* her students, this teacher was in the end fired for stepping on a political land mine—one which she never even knew was there. This case was wrongly decided. I vote to grant the petition for rehearing en banc.