SUTTON, Circuit Judge,
concurring.
I concur in Judge Cole’s opinion, which accurately follows our cases and this com *234 plaint where they lead us. I write separately to explain what is (and what is not) at issue in this case, why our cases compel the rejection of the defendants’ motion to dismiss the complaint for failure to state a claim and why this case illustrates to me that our circuit should re-examine its First Amendment jurisprudence in the context of in-class curricular speech.
First, whatever else Evans-Marshall may complain about when it comes to the school district’s oversight of her curricular choices in teaching high school English, she may not complain about the school district’s infringement of her free-speech rights when it came to the assignment of To Kill a Mockingbird, Siddhartha and Fahrenheit b51. These books, quite understandably, appeared on the school district’s list of books approved for high school English. When Evans-Marshall asked her students to read these classics, it thus was not her speech that was at issue but the school district’s. And, indeed, her complaint never says that the school district based its decision to terminate her on the ground that she taught books that the school district said she could. What her complaint does say is that the school district terminated her based on the methods she used in teaching these books and in discussing them in class.
Second, our case law permits such a cause of action, allowing primary and secondary public school teachers to bring a First (and Fourteenth) Amendment retaliation claim in response to a termination decision arising from their methods of teaching and from their in-class curricular speech. Like the court today, I can find no ground at this early stage in the litigation to distinguish Cockrel v. Shelby County School District, 270 F.3d 1036 (6th Cir.2001), which held that a fifth-grade teacher had a First Amendment right to invite an actor into her classroom to give a presentation about industrial hemp. Id. at 1055. No principled distinction exists between an in-class presentation by a visiting speaker, which is one method of teaching, and an in-class discussion of reading materials, which is another. And no principled distinction exists between the matter of public concern at stake in Cockrel (the virtues of industrial hemp) and the themes of racial justice, spiritual awakening and government censorship that Evans-Marshall discussed while teaching To Kill a Mockingbird, Siddhartha and Fahrenheit J/.51.
Given our case law, the path that Judge Cole has taken in resolving this dispute is the path that has been charted for us. And that is all the more true when one accounts for the balancing test that governs these claims and for the preliminary stage of this litigation. Our cases first ask whether the teacher’s speech “touches on a matter of public concern.” See Cockrel, 270 F.3d at 1053. They then ask whether “the employee’s interest in speaking” outweighs “the employer’s interest in regulating the speech” to determine if the speech is constitutionally protected. Id.; see Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); Pickering v. Bd. of Educ., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). In the absence of discovery concerning why the teacher spoke and why the school district restricted her speech, it is difficult to understand how a court has any choice but to deny a motion to dismiss premised on the contention that no constitutional violation occurred.
Individual defendants likewise will only rarely be able to establish that the right was not “clearly established” at this stage of the dispute. The case-by-case, incremental decisionmaking of balancing tests, it is true, infrequently will provide the “fair notice” that qualified-immunity prece *235 dent requires, as each case may contain unique employee interests in speaking and unique employer concerns in restricting the speech. See Brosseau v. Haugen, 543 U.S. 194, 125 S.Ct. 596, 599, 160 L.Ed.2d 583 (2004) (noting that, unless the case is an “obvious one” or “clearly established” in a “particularized sense,” “fair warning” for qualified immunity cannot be found in “general tests”); Lyons v. City of Xenia, 417 F.3d 565, 579-80 (6th Cir.2005). But just as these considerations frequently will make it difficult for a plaintiff to surmount a qualified-immunity defense after discovery, so they make it difficult for a defendant to claim qualified immunity on the pleadings before discovery and before the parties (much less the courts) know what is being balanced against what. See McKenna v. Wright, 386 F.3d 432, 436 (2d Cir.2004); Jacobs v. City of Chicago, 215 F.3d 758, 774-76 (7th Cir.2000) (Easterbrook, J., concurring); see also Behrens v. Pelletier, 516 U.S. 299, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996). Absent any factual development beyond the allegations in a complaint, a court cannot fairly tell whether a case is “obvious” or “squarely governed]” by precedent, which prevents us from determining whether the facts of this case parallel a prior decision or not.
Third, while I am prepared to accept these conclusions in this case, I respectfully believe that our circuit should re-think the way it has applied Connick and Pickering to in-class curricular speech. The Supreme Court has never held that the First Amendment applies to a teacher’s classroom speech, and there is good reason to think that it would not do so. In Connick, the Court said that “when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee’s behavior.” 461 U.S. at 147, 103 S.Ct. 1684. Connick, then, draws two dichotomies: (1) between speech by public employees acting as “employees” and speech by public employees acting as private “citizens”; and (2) between speech “on matters of public concern” and speech “upon matters of personal interest.” When public school teachers speak as “employees,” even when they speak on “matters of public concern,” the First Amendment thus does not protect their speech under Connick, a conclusion that respects the reality that it is the employer (not the employee) who bears ultimate responsibility for what goes on in the classroom, the reality that virtually all speech by public school teachers in the classroom involves speech in the teacher’s capacity as an employee and the reality that many public school teachers (consider English, History and Government teachers) speak about “matters of public concern” virtually every day of the school year. Only when teachers speak as private citizens on matters of public concern does the First Amendment and the Pickering balancing test apply.
When, by contrast, teachers “speak in the course of carrying out their routine, required employment obligations, they have no personal interest in the content of that speech.” Ceballos v. Garcetti, 361 F.3d 1168, 1189 (9th Cir.2004) (O’Scannlain, J., concurring), cert. granted, — U.S. —, 125 S.Ct. 1395, 161 L.Ed.2d 188 (2005). The school district bears responsibility for the speech, and for First Amendment purposes it therefore is the speaker and it therefore has the right to retain control of the speech — or, more precisely, to retain control over what is being taught in the classroom. See id.; cf. Rust v. Sullivan, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991); Rosenberger v. Rector *236 & Visitors of Univ. of Virginia, 515 U.S. 819, 833, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (holding that “[w]hen the government appropriates public funds to promote a particular policy of its own,” it may “say what it wishes” and “may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted by the grantee”).
To my knowledge, .no other circuit has applied the Pickering balancing test to in-class speech of this sort. Some circuits have adopted the analysis that I have outlined above. See Edwards v. Cal. Univ. of Pa., 156 F.3d 488, 491 (3d Cir.1998) (“[A] public university professor does not have a First Amendment right to decide what will be taught in the classroom.”); Boring v. Buncombe County Bd. of Educ., 136 F.3d 364, 366 (4th Cir.1998) (en banc) (holding that “a public high school teacher [does not have] a First Amendment right to participate in the makeup of the school curriculum through the selection and production of a play”); Kirkland v. Northside Indep. Sch. Dist., 890 F.2d 794, 795 (5th Cir.1989) (holding that “the first amendment does not vest public school teachers with authority to disregard established administrative mechanisms for approval of reading lists”). And some circuits have extended the Supreme Court’s more lenient test for assessing student in-class speech, see Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), to teacher in-class speech, though to my knowledge none of these circuits has upheld a First Amendment claim in this area. See Lacks v. Ferguson Reorganized Sch. Dist. R-2, 147 F.3d 718, 719 (8th Cir.1998) (holding that “a school district does not violate the First Amendment when it disciplines a teacher for allowing students to use profanity ... in their written work”); Silano v. Sag Harbor Union Free Sch. Dist. Bd. of Educ., 42 F.3d 719, 724 (2d Cir.1994) (holding that a teacher does not have a “First Amendment right to use a film-clip showing bare-breasted women in a lecture to a tenth-grade mathematics class”); Ward v. Hickey, 996 F.2d 448, 453 (1st Cir.1993) (analyzing teacher in-class speech under the Hazelwood standard); Bishop v. Aronov, 926 F.2d 1066, 1074 (11th Cir.1991) (holding that “the University’s interests in the classroom conduct of its professors are sufficient ... to warrant the reasonable restrictions it has imposed” on a professor and that “[t]he University must have the final say in such a dispute”); Miles v. Denver Pub. Sch., 944 F.2d 773 (10th Cir.1991) (holding that a school board may regulate a teacher’s in-class speech); Webster v. New Lenox Sch. Dist. No. 122, 917 F.2d 1004, 1008 (7th Cir.1990) (“Given the school board’s important pedagogical interest in establishing the curriculum and legitimate concern with possible establishment clause violations, the school board’s prohibition on the teaching of creation science to junior high students was appropriate.”). Two circuits, it is true, have applied Pickering in what could be described as educational settings. See Goldwasser v. Brown, 417 F.2d 1169 (D.C.Cir.1969) (applying Pickering to government employee terminated because of the manner in which he taught foreign service officers); Nicholson v. Bd. of Educ. Torrance Unified Sch. Dist., 682 F.2d 858 (9th Cir.1982) (applying Pickering to teacher terminated because of decisions he made as the high school’s newspaper ad-visor). But both cases fail to address pure in-class curricular speech by a primary or secondary school teacher, and both cases at any rate rejected the claims. Contrary to the suggestion of the majority opinion, Givhan v. Western Line Consolidated School District, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), does not establish any presumptions about how to handle the Fust Amendment implications of in-class *237 speech but instead deals with private comments between a teacher and principal made outside of class.
Not only do the terms of the Connick inquiry support the position that localities should be able to determine what teachers may (and may not) say in class, so also does the Supreme Court’s tradition of deferring to local school boards with regard to educational matters. “In the First Amendment arena and other arenas as well, the Supreme Court [ ] has frequently emphasized that public schools have considerable latitude in fashioning rules that further their educational mission.” Blau v. Fort Thomas Pub. Sch. Dist., 401 F.3d 381, 393 (6th Cir.2005). “The very complexity of the problems of ... managing a statewide public school system suggests that there will be more than one constitutionally permissible method of solving them,” San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 42, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (quotations omitted), which is why “the determination of what manner of speech in the classroom ... is inappropriate properly rests with the school board rather than with the federal courts,” Hazelwood, 484 U.S. at 267, 108 S.Ct. 562 (citation and quotations omitted); cf. Sweezy v. New Hampshire, 354 U.S. 234, 255, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957) (Frankfurter, J., concurring) (noting that a university should “determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study”); Boring, 136 F.3d at 371 (Wilkinson, J., concurring) (“Traditionally, indeed for most of our history, education has been largely a matter of state and local concern.”). As today’s case illustrates, our circuit’s decisions in this area risk “remov[ing] from students, teachers, parents, and school boards the right to direct their educational curricular through democratic means. The curricular choices of the schools should be presumptively their own-the fact that such choices arouse deep feelings argues strongly for democratic means of reaching them.” Boring, 136 F.3d at 371-72.
No less importantly, this approach accords with the realities of the classroom. To say that the First Amendment applies to classroom speech — and, as here, to the methods by which teachers teach their courses — is to say that the provision applies to almost everything a teacher does from the first ring of the school bell to the last. Vital as the free-speech guarantee is to American government, no school operates solely on Justice Holmes’ premise that “the best test, of truth is the power of the thought to get itself accepted in the competition of the market.” Abrams v. United States, 250 U.S. 616, 630, 40 S.Ct. 17, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting). Only a structured curriculum permits each school to advance its educational mission, which includes the. assignment and discussion of works in class — the very activities about which Evans-Marshall complains and over which she claims a First Amendment interest. A school may, for the most simple reasons or the most complex, prefer Shakespeare to Siddhartha or Faulkner to Fahrenheit 151. A school may prefer that the books be taught sequentially, believing that To Kill a Mockingbird is appropriate for 13-year-olds but that Siddhartha becomes appropriate only a few years after that. A school may prefer that its teachers discuss certain themes from literary works, and not others, in the time allocated for each class. And a school may believe certain materials or themes not appropriate for young children, preferring them to be brought out at a later point in a child’s development.
Taken seriously, however, the application of the free-speech guarantee to in- *238 class curricular speech not only undermines these basic assumptions about the management of our schools but also risks transforming many employment disputes into First Amendment retaliation claims. What terminations arising from an employee’s method of teaching will not involve speech or, as Evans-Marshall puts it, “academic freedom”? May a teacher claim that a school board’s requirement that the teacher discuss certain materials in class impermissibly compels his speech? Cf. West Virginia State Bd. of Educ. v. Bar-nette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). May a teacher insist on assigning materials that some may perceive as racist and insist on discussing them when the school board has told him not to? May a teacher raise a controversial topic (say, intelligent design) when a school board has told him not to? May a teacher insist on introducing mature sexual themes when discussing a work of literature when a school board has told him not to? Does a music teacher retain veto power over that most controversial of school productions — the Holiday Concert? And in the end does every disagreement in this area “plant the seed of a constitutional case”? Connick, 461 U.S. at 149, 103 S.Ct. 1684.
It is precisely because “one man’s vulgarity is another’s lyric,” Cohen v. California, 403 U.S. 15, 25, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971), that parents long have insisted that school boards and school administrators retain control over the curriculum and the methods of teaching it to their impressionable children. Permitting federal courts to distinguish classroom vulgarities from lyrics or to decide whose method of teaching Siddhartha is superi- or — the school district’s or Evans-Marshall’s — not only disenfranchises the 9,000 or so members of the Tipp City community but also tests the boundaries of judicial competence. If even the most happily married parents cannot agree on what and how their own children should be taught, as I suspect is not infrequently the case, what leads anyone to think the federal judiciary can answer these questions? Submitting issues of this sort to the federal courts is not a sensible way to make decisions about the books that children read in public school or about the way books are taught in school, and it is not something that the Constitution mandates. Because it is the method that our circuit’s case law appears to have adopted, however, I respectfully concur in today’s opinion.