**Allisa DOCK, Plaintiff,**

v.

**DES MOINES INDEPENDENT COMMUNITY SCHOOL DISTRICT and Sheila Mason, Defendants.**

**No. 4:07–cv–00065–RAW.**

United States District Court,
S.D. Iowa,
Central Division.

Feb. 11, 2009.

Scott Lyle Bandstra, Bandstra Law Firm, P.C., Des Moines, IA, Mark D. Sherinian, Sherinian & Walker PC, West Des Moines, IA, for Plaintiff.

Nicholas A. Klinefeldt, Ahlers & Cooney PC, Des Moines, IA, for Defendants.

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ROSS A. WALTERS, United States Magistrate Judge.

Before the Court following hearing is defendants' motion for summary judgment [21]. Plaintiff Allisa Dock was terminated from her job as a bus associate for the Des Moines Public School District ("District") as a result of an incident between Ms. Dock and her supervisor, Sheila Mason, on March 2, 2006. Ms. Dock filed a petition in the Iowa District Court for Polk County on January 16, 2007 in which she made claims of gender and race discrimination by defendants in violation of the Iowa Civil Rights Act of 1965, Iowa Code ch. 216, and

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* Defendants removed the petition to this Court on February 14, 2007 on the basis of federal question jurisdiction. 28 U.S.C. §§ 1331, 1441(a) and (b). The case was referred to the undersigned for all further proceedings pursuant to 28 U.S.C. § 636(c).

At hearing plaintiff abandoned her sex discrimination claims. The motion for summary judgment will be granted on those claims and this ruling deals only with plaintiff's race discrimination claims. The motion is submitted on the motion papers and arguments of counsel.

## I.

### SUMMARY JUDGMENT

Defendants are entitled to summary judgment if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," Fed. R.Civ.P. 56(c), presented to the court, show " 'that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Carrington v. City of Des Moines, Iowa,* 481 F.3d 1046, 1050 (8th Cir.2007) (quoting Fed.R.Civ.P. 56(c)); *see Hervey v. County of Koochiching,* 527 F.3d 711, 719 (8th Cir.2008). A genuine issue of material fact exists "if it has a real basis in the record." *Hartnagel v. Norman,* 953 F.2d 394, 395 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A "genuine issue of fact is material if it 'might affect the outcome of the suit under the governing law.' " *Id.* (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

■ The court must view the facts in the light most favorable to the nonmoving party, and give that party the benefit of all reasonable inferences which can be drawn from them. *See Hervey,* 527 F.3d at 719;

*EEOC v. Liberal R–II Sch. Dist.,* 314 F.3d 920, 922 (8th Cir.2002). Reasonable inferences are "those inferences that may be drawn without resorting to speculation." *Mathes v. Furniture Brands Int'l, Inc.,* 266 F.3d 884, 885–86 (8th Cir.2001) (citing *Sprenger v. Fed. Home Loan Bank of Des Moines,* 253 F.3d 1106, 1110 (8th Cir. 2001)); *see Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348; *Riley v. Lance, Inc.,* 518 F.3d 996, 1001 (8th Cir.2008); *Erenberg v. Methodist Hosp.,* 357 F.3d 787, 791 (8th Cir.2004).

The moving party must first inform the court of the basis for the motion and identify the portions of the summary judgment record which the movant contends demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Robinson v. White County, Ark.,* 459 F.3d 900, 902 (8th Cir.2006). The nonmoving party must then "go beyond the pleadings and by affidavits, depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue of material fact." *Rouse v. Benson,* 193 F.3d 936, 939 (8th Cir.1999); *see In re Patch,* 526 F.3d 1176, 1180 (8th Cir.2008); *Thomas v. Corwin,* 483 F.3d 516, 526–27 (8th Cir.2007); *Littrell v. City of Kansas City, Mo.,* 459 F.3d 918, 921 (8th Cir.2006).

■ Summary judgment should be approached with caution in employment discrimination cases because they are "inherently fact based." *Simpson v. Des Moines Water Works,* 425 F.3d 538, 542 (8th Cir.2005)(quoting *Mayer v. Nextel West Corp.,* 318 F.3d 803, 806 (8th Cir.), *cert. denied,* 540 U.S. 823, 124 S.Ct. 153, 157 L.Ed.2d 43 (2003), quoting in turn *Keathley v. Ameritech Corp.,* 187 F.3d 915, 919 (8th Cir.1999)). However, "no separate summary judgment standard exists for discrimination ... cases and ... such cases

are not immune from summary judgment." *Wallace v. DTG Operations, Inc.,* 442 F.3d 1112, 1118 (8th Cir.2006)(citing *Berg v. Norand Corp.,* 169 F.3d 1140, 1144 (8th Cir. 1999)).

## II.

## FACTUAL BACKGROUND

Plaintiff Allisa Dock is an African American woman who had worked with the District since 1987. (Def. App. at 49). In 2005 she was working as a bus associate. (*Id.*) A bus associate rides school buses with a driver to assist students with disabilities. (*Id.* at 1). Her mother and sister, Katherine Burrage and Jessie Burrage, also worked as bus associates for the District. (*Id.* at 2).

Ms. Dock reported to Transportation Supervisor Todd Liston. Mr. Liston reported to either defendant Sheila Mason or Deputy Director of Management Support Services Jerry Weiss. Mr. Liston usually worked with Ms. Mason directly. (Def. App. at 2). Ms. Mason was the Executive Director of Management Support Services for the District. (*Id.* at 1). In that capacity she supervised the Transportation, Food and Nutrition, Custodial, Purchasing, and Central Stores departments. (*Id.*) She began employment with the District in August 2005. (*Id.*) Ms. Mason is Caucasian. She has been involved in a long-term domestic relationship with an African–American male. (*Id.* at 6).

Ms. Mason's and Mr. Liston's offices are located on the first floor of the District "bus garage." (Def. App. at 2). The bus associates are based out of this building and report to it prior to each route and end their route there. A break room used by the bus associates is also located in the building. (*Id.*)

The parties dispute how their work relationship began and progressed. Ms. Dock says the relationship initially was friendly. Ms. Mason says Ms. Dock would not respond to her greetings, gave her dirty looks and would leave the room when Ms. Mason entered. Each accuses the other of rolling their eyes at them, giving angry and hostile looks, and making faces during the course of their work relationship.

In October 2005 Ms. Dock approached Ms. Mason to discuss an incident which had occurred before Ms. Mason joined the District. (Def. App. at 3). Ms. Mason says she asked Ms. Dock if she had discussed the incident with Jerry Weiss. Mr. Weiss uses a wheelchair. She says Ms. Dock referred to Mr. Weiss as "Ironside," leading Ms. Mason to tell Ms. Dock the comment was inappropriate. She says at this time she also told Ms. Dock that Ms. Dock was making comments in the workplace about "hat[ing] everybody here" which could not be allowed because they scared people. (*Id.*) Ms. Dock does not recall referring to Mr. Weiss as "Ironside" or that she ever had a conversation with Ms. Mason on the subject. (*Id.* at 59). She says any other comments were probably made in a joking manner. (*Id.*)

The parties had another encounter in November or December 2005 in the break room. Ms. Mason says she was in a meeting when Duane Van Hemert, the Executive Director of Facilities, came and told her "someone [was] causing a commotion in the break room." (Def. App. at 3). When Ms. Mason entered the room, she heard Ms. Dock talking "loudly about how she hated 'this place' and how she hated everybody." (*Id.*) Ms. Mason says she asked Ms. Dock what the problem was and asked her to come back to her office. (*Id.*) According to Ms. Mason, "Ms. Dock told me that she could do anything she wanted to in there, and refused to come back to my office." (*Id.*) Ms. Mason left the room.

Apparently referring to this incident, Ms. Dock has testified that prior to Ms.

Mason entering the break room, a number of people, including her mother, were "joking and laughing, having fun," (Def. App. at 60), and "being loud." (*Id.* at 58; *see also id.* at 21). Ms. Dock says that upon entering the room Ms. Mason yelled at Ms. Dock and her mother "[w]hat are you troublemakers doing." (*Id.* at 58). Ms. Dock responded that she was not a troublemaker and she and her mother left the room. (*Id.*) She denies that Ms. Mason asked her to come to her office. Ms. Dock says Ms. Mason started rolling her eyes and making faces at her after this incident. (*Id.* at 60).

According to Ms. Mason after Christmas 2005 she discovered that some 25 years before she had been to the home of another employee in the company of an African–American man she was dating, Kevin Brown. (Def. App. at 3). Ms. Mason said that later Ms. Dock came to her and said she had also dated Mr. Brown and they made a joke about the connection. (*Id.*) In her deposition Ms. Dock denied that she dated Brown, saying she was a friend of his. (*Id.* at 64). It was after this discovery, Ms. Dock says, that her relationship with Ms. Mason changed and Ms. Mason started rolling her eyes and making faces at Ms. Dock. (*Id.* at 76).[1]

At about the same time the District learned that Ms. Dock's sister, Jessie Burrage,[2] had not been reporting to the bus garage at the start of her work day but to the first stop of her bus. (Def. App. at 4). The District made Ms. Burrage report to the bus garage from then on. (*Id.*) Afterward Ms. Mason saw Ms. Burrage walk in

with Ms. Dock and Ms. Dock gave Mason more dirty looks. (*Id.* at 4).

In her affidavit Ms. Mason describes what she says is another example of the kind of workplace comment Ms. Dock made. An employee was wearing shorts on a cold day. Ms. Mason said something to the employee about wearing shorts when it was not warm. Ms. Dock was passing by and, according to Ms. Mason, said in a "nasty tone," "[t]hat's because he's stupid!" (Def. App. at 4). In her affidavit Ms. Dock responds she and the employee were like brother and sister. She denies calling the employee "stupid," but says she told him he was crazy for wearing shorts in the winter. (Pl. Aff. [34] at 2).

The incident which led to Ms. Dock's termination occurred on March 2, 2006. The parties' versions of it are very different. In her affidavit Ms. Mason states she walked into the break room and was joking with employees there that she was weighing in for a Biggest Loser contest and everyone had to leave the room. (Def. App. at 4). She says Ms. Dock and her mother walked into the room; Ms. Dock ignored her and Ms. Burrage said good morning "begrudgingly and in a rude manner." (*Id.*)

Later Ms. Mason stopped in the dispatch area, where she spoke with a new employee and two others about how things were going. (Pl. App. at 83; Def. App. at 4). Ms. Mason says she overheard a conversation between Ms. Dock and two other employees, Lucille Furnish and Anthony Carter, in which Mr. Carter said some-

---

1. In connection with the investigation of the incident which led to Ms. Dock's termination, she told the investigator she had "gone" with Mr. Brown. It is not clear, but she also seems to have implied Ms. Mason's discovery of their connection to Mr. Brown occurred prior to the break room incident. (Def. App. at 22).

2. Ms. Mason describes Jessie Burrage as Ms. Dock's sister. (Def. App. at 4). In her response to defendants' statement of facts, Ms. Dock states Jessie Burrage was her stepdaughter, referring to an affidavit from Ms. Dock which does not address the subject. (Pl. Resp. to Def. Stmt. of Facts at 4; Pl. Aff. [34]).

thing like the District was "short drivers" to which Ms. Dock responded "they get what they deserve," or "they deserve what they get" "in a very ugly tone." Ms. Dock then glared at Ms. Mason. (Def. App. at 4). Ms. Mason thinks Furnish or Carter said something to Ms. Dock because Ms. Dock then stated "I don't care" and continued to glare at Ms. Mason. Ms. Mason states Ms. Dock then said to her "You got a problem?" in an "ugly" tone. (*Id.* at 5). Ms. Mason then asked Ms. Dock to come back to her office. Ms. Dock refused. Ms. Mason asked Ms. Dock again to come back to her office. Ms. Dock again refused. Ms. Mason then told Ms. Dock she was giving her a directive to come to her office, then walked back in that direction with Ms. Dock following. (*Id.*)

Ms. Dock saw union representative Urasaline "Rossi" Frith nearby. Ms. Dock asked if Ms. Frith could come with them. Ms. Mason agreed and the three went into Ms. Mason's office. (Def. App. at 5). In her affidavit Ms. Mason described what happened in the office:

> . . . Ms. Dock refused to sit down at the table. She kept walking back and forth from the front of my desk to the side of my desk. I was sitting at my desk, Ms. Frith was sitting at the table in my office, and my office door was closed. I explained to Ms. Dock that she was in violation of Work Rule No. 4 in that she was being insubordinate. Ms. Dock was yelling at me and kept interrupting me, screaming out "Whatever! Whatever! You got a personal problem with me." At one point, Ms. Dock came around my desk and was leaning over into my personal space pointing her finger at me, sticking it in my face to the point where it was just inches away from my face, and yelling at me. I remained seated

and was backed up against a credenza in my office. Ms. Dock was yelling, "I'm going to get a lawyer! You don't ever speak to me." I said, "Right now, you aren't even respectful enough to me to sit down and have a conversation. If you act this way in front of me, how do I know you don't behave this way on the bus?" I also told her that I did not appreciate the way she spoke to me near the dispatch desk, and she yelled back, "I'm a grown woman. I am forty-three years old and you can't talk to me anyway you want to."

(*Id.* at 5).[3] Ms. Mason says she told Ms. Dock this was the third time she had talked to her about her conduct, referring to the comment about Mr. Weiss and the incident in the break room. (*Id.* at 6). As Ms. Dock left Ms. Mason's office with Frith, Dock made a comment about their dispute being "personal" and that Ms. Mason was jealous of her. (*Id.*)

Ms. Dock has testified that on arriving for work on March 2, she signed in, went into the break room to get some candy, then went into a bathroom across the hall. When she came out she saw Ms. Mason "storm[ ] out of the break room" and go into her office. (Def. App. at 66). Ms. Dock says she then went to the dispatch area to wait for her bus. (*Id.*)

While in the dispatch area Ms. Dock spoke with Anthony Carter, with Lucille Furnish and Lisa Lechuga present. (Def. App. at 66). Carter made a remark about the number of absentees from work that day. Ms. Dock testified she responded it was "[p]robably because the way people was being treated." (*Id.*) Carter had seen an article in the newspaper about the local transit authority possibly taking over their jobs. Ms. Dock says they talked

3. The Work Rule No. 4 Ms. Mason referred to made it a workplace offense to "fail[ ] to maintain satisfactory and harmonious work- ing relationships with the public, students or other employees." (Def. App. at 40).

about that and about how things used to be, like family. (*Id.* at 20, 66). In her later investigation statement Ms. Dock said she told Carter that the District got what it deserved. (*Id.* at 20). About this time Ms. Dock says she noticed Ms. Mason, who had been in a conversation with other employees, looking at her "like I cussed somebody out." (*Id.*) Ms. Mason then stated "I heard what you said" and "you all have a problem." (*Id.* at 66–67, 69–70). Ms. Mason followed this with the statement "you need to come to my office." (*Id.* at 70). Ms. Dock's testimony is not clear at this juncture, she either made no response because she did not know who Mason was talking to or asked Mason what was wrong. (*Id.* at 67, 70). Ms. Mason repeated her statement about coming to the office, this time using Ms. Dock's name. (*Id.* at 67, 71). Ms. Dock says she told Ms. Mason she was waiting for her bus and that whatever she had to say she could say it in front of everybody. (*Id.*) Ms. Mason repeated her directive a third time, Ms. Dock noticed Ms. Frith and asked her to go with her, and Dock and Frith then followed Mason to her office. (*Id.*)

Once in the office Ms. Dock says she did not refuse to sit down, but stood and paced because she had chronic back pain from previous auto accidents. (Def. App. at 72, 78). Ms. Dock testified she explained to Ms. Mason she could not sit down because her back hurt. (*Id.* at 72). Ms. Mason told her she had "badgered the job" and showed her and Ms. Frith a page in some kind of rule book that talked about it. (*Id.* at 72). Ms. Dock did not understand what badgering the job meant. (*Id.* at 73). She told Ms. Mason she was just answering a co-worker's question. (*Id.* at 21). In connection with the investigation which followed the incident Ms. Dock described the conversation from this point as follows:

I said, "Well, I'll go across the street when somebody asks me a question. I won't say anything in the building. I'll go across the street." Then from there she said, "No, you won't go across the street. You'll go off my property." I said, "Whatever. I got to go get on my bus and do my job." Then she proceeded to say, "Since you're badgering the job at the bus garage, how do I know that you're not badgering the kids?" I said, "You're very welcome to get on my bus and see how I do my job. But I'm not going to stand around and let you tell me that I'm badgering my kids because that's not my job. Your problem is personal with me. Because I wasn't the only one talking." Shop talk. I wasn't the only one talking. She kept stressing that I didn't say hi to her. "Your mom said 'hi', but you didn't say 'hi.'" I just told her, "I don't have to say 'hi' to anybody that I don't want to say 'hi' to."

(*Id.* at 21). Ms. Dock denied screaming at Ms. Mason. In her deposition she said she talked loudly, but no louder than she usually did. (*Id.* at 23, 74). Ms. Dock denied invading Ms. Mason's personal space or sticking her finger in her face. She testified she was standing between Ms. Mason's desk and a table and did not get close to her. (*Id.* at 23).

Ms. Frith's deposition testimony about what occurred in the office is generally supportive of Ms. Dock with respect to Dock's conduct and demeanor. Ms. Frith has testified that while both Ms. Dock and Ms. Mason raised their voices, there was no yelling. (Pl. App. at 23). Ms. Frith says Ms. Dock never got closer than a foot or two from the edge of Ms. Mason's desk, nor within about four feet of Ms. Mason's person. (*Id.* at 23, 25). Ms. Dock did not lean over the desk or make threatening gestures toward Ms. Mason. Ms. Dock gestured with her hands, but she did not point at Ms. Mason in the manner described by Ms. Mason. (*Id.* at 24–25).

Ms. Frith did not see Ms. Dock go around the desk into Ms. Mason's personal space. (*Id.* at 23–24).

Ms. Mason's secretary Sandra Townes (who is also African–American) was near Ms. Mason's office. In her affidavit Ms. Townes says that when she entered the office to tell Ms. Dock and Ms. Frith their buses were ready to leave, she saw Ms. Mason sitting in her chair at her desk, Ms. Frith sitting at a table, and "Ms. Dock standing within a foot or so of Ms. Mason with her arm in the air talking to Ms. Mason." (Def. App. at 9). Before she entered, Ms. Townes overheard the parties talking, with Ms. Dock shouting at intervals "you are jealous of me," "you have a personal problem with me," "you think you are better than me," and "whatever, whatever." (*Id.* at 8–9).

Four employees (one of them Mr. Weiss) meeting in a conference room next to Ms. Mason's office later told the District investigator they heard a loud voice or voices coming from Ms. Mason's office. Three of the employee stated the voice(s) did not belong to Ms. Mason. Two others in the conference room said they heard nothing. (Def. App. at 30–32).

Later on March 2, 2006 the incident was reported to Doug Willyard, the Deputy Director of Human Resources/Labor Relations for the District, either by Ms. Mason or Mr. Weiss. (Def. App. at 10, 101). Mr. Willyard handles matters with respect to discipline and job termination for the Transportation Department. (*Id.* at 10). Mr. Willyard talked to Ms. Mason about what had happened and Ms. Mason told him she felt threatened. (*Id.* at 102).

The District's normal process for dealing with complaints of employee behavior was (a) complaints would be referred to Willyard, if possible; (b) he would decide whether an investigation was needed; (c) if so, he would engage Amanda Easton, the District Human Resources Investigations Specialist, to do an investigation; (d) Ms. Easton would conduct an investigation and issue a report; (e) Ms. Easton would give a copy of the report to Mr. Willyard and to Twyla Woods, who at the time was the Executive Director of Human Resource Management for the District; (f) both Mr. Willyard and Ms. Woods would review the report; (g) Mr. Willyard would follow up on the report to the extent necessary; (h) Mr. Willyard would review other relevant matters, including the discipline issued to other employees for similar conduct; (i) if a termination decision was to be recommended, he would review it with the law firm which represented the District; (j) he would then make a recommendation; (k) Ms. Woods would review the recommendation with him; (*l*) Ms. Woods would make the ultimate decision as to the discipline to be issued; and (m) Mr. Willyard would communicate the decision to the affected employee. (Def. App. at 10–11).

After talking to Ms. Mason, Mr. Willyard referred the matter to Ms. Easton for investigation. (Def. App. at 102). Ms. Dock was placed on paid leave pending investigation. (*Id.* at 11).

Ms. Easton, who is of Puerto Rican/African–American descent (Def. Supp. App. at 4), conducted an investigation during which she interviewed Ms. Mason, Ms. Dock, Mr. Carter, Ms. Furnish, Ms. Judy Walton, Ms. Robin Pickard, Mr. Chuck Fisher, Ms. Cindy Paschka, Mr. Weiss, six zone managers meeting during the incident in the conference room adjoining Ms. Mason's office, Ms. Townes, Mr. Rick Dubberke, Ms. Katherine Burrage, and Ms. Jessica Edwards. (Def. App. at 13–37). Ms. Frith declined to be interviewed, citing her role as a union representative. (*Id.* at 30). Ms. Mason raised the subject of race in her statement to Ms. Easton, telling Easton:

I've had employees who wish to remain anonymous approach and call me to say that they've been cornered by Katherine (Burrage) regarding this incident asking them things like, "What color are you?" and then making remarks like, "Yea, we're black and we need to stick together." I think she's trying to rally the African–American employees to file a discrimination complaint against me. This has nothing to do with race. Lisa got suspended because of her conduct. I had to give her three verbal warnings regarding her extremely negative remarks. And then she verbally attacked me. That's why Lisa got suspended. It had nothing to do with her race. If she hadn't been in the lobby making negative remarks about the District or glaring at me and confronting me in a hostile way, she would have never been asked back to my office. And if she hadn't repeatedly refused to come back to me [sic] office or entered my office and started yelling at me, interrupting me, talking over me, sticking her finger in my face or violating my personal space, she wouldn't have been suspended. This investigation and any disciplinary action she gets is a direct result of her behavior that day.

(*Id.* at 18–19).

Based on the information gathered in her interviews, Ms. Easton found Ms. Dock had been insubordinate, apparently in twice refusing to go with Ms. Mason to her office. (Def. App. at 37–38). Ms. Easton also found:

> [T]he preponderance of the evidence indicates [Ms. Dock] acted in an intolerant, abusive manner toward [Ms. Mason] which had the impact of creating a hostile work environment for [Ms. Mason].

(*Id.* at 38, underlining omitted). Ms. Easton did not make a disposition recommendation. The District has a policy against creating a hostile work environment. (*Id.* at 42).

Prior to the March 2 incident Ms. Dock had not had any formal disciplinary sanctions and her performance evaluations had been satisfactory. (Pl. App. at 106).

District employees were governed by a union agreement which provided with respect to "Discipline and Discharge:"

> Disciplinary actions shall include only the following:
>
>> Oral reprimand
>>
>> Written reprimand
>>
>> Suspension (notice to be given in writing)
>>
>> Discharge (notice to be given in writing)
>
> The type of corrective action that is applied is generally determined by the seriousness of the offense. Those offenses of less serious nature do not usually require immediate dismissal, but may require some form of corrective action. Offenses of serious nature may justify immediate discharge without prior warning or attempts at remedial action. An employee may be disciplined or discharged for any reason which is just and sufficient.

(Pl. App. at 2–3).

Mr. Willyard reviewed Ms. Easton's report. He spoke with Jerry Weiss, who had been in the zone manager meeting in the conference room next to Ms. Mason's office, to confirm the intensity of the conversation he had overheard. (Pl. App. at 105). Mr. Willyard also talked to Ms. Mason "during the process of determining what discipline I would recommend to Ms. Woods," though Ms. Mason did not opine that Ms. Dock should be terminated. (Def. App. at 12). Mr. Willyard was impressed with the "intensity and threatening nature" of the incident, (*Id.* at 104), which he thought warranted termination.

He recommended termination to human resource Executive Director Twyla Woods.

Ms. Woods received and reviewed Mr. Willyard's recommendation. Ms. Woods is an African–American woman. (Def. App. at 44). Based on Ms. Woods' review of the Ms. Easton's report and Mr. Willyard's recommendation, she concurred in the recommendation to terminate. She believed there was "sufficient evidence that [Ms. Dock] was not only insubordinate but she was hostile in her interaction with her supervisor. Aggressive, threatening." (Pl. App. at 115). From Ms. Woods' description of the facts she relied on, the hostility, aggressive and threatening behavior had mainly to do with what occurred in Ms. Mason's office. (Id. at 115–17). On April 3, 2006 Mr. Willyard sent Ms. Dock a written notice of termination of employment effective that date. (Def. App. at 43). The reasons given for termination were insubordination and creation of a hostile work environment towards Sheila Mason. (Id.)

This lawsuit followed. Other facts as may be pertinent to resolution of the motion will be discussed in connection with the applicable law.

## III.

### DISCUSSION

 Both sides analyze this case under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[4] *See King v. U.S.*, 553 F.3d 1156, 1159–60 (8th Cir.2009); *Fields v. Shelter Mut. Ins. Co.*, 520 F.3d 859, 863–64 (8th Cir.2008). Under that analysis, plaintiff must first establish a *prima facie* case of discrimination. *Jackson v. United Par-*

cel Service, Inc., 548 F.3d 1137, 1140 (8th Cir.2008). The burden then shifts to defendant to rebut the presumption of unlawful discrimination arising from a *prima facie* case by articulating a legitimate nondiscriminatory reason for its actions. *Gilbert v. Des Moines Area Community College*, 495 F.3d 906, 914 (8th Cir.2007). The burden then shifts back to plaintiff to show the explanation is a pretext for unlawful discrimination. *Id.*

 To establish a *prima facie* case of racially-discriminatory termination, plaintiff must establish she "(1) is within the protected class, (2) was qualified to perform [her] job, (3) suffered an adverse employment action, and (4) has facts that give rise to an inference of . . . discrimination." *McGinnis v. Union Pac. R.R.*, 496 F.3d 868, 874 (8th Cir.2007); *see Johnson v. AT & T Corp.* 422 F.3d 756, 761 (8th Cir.2005). "The actual evidentiary burden that a plaintiff must meet at the *prima facie* stage [is] 'minimal.'" *Stewart v. Ind. Sch. Dist. No. 196*, 481 F.3d 1034, 1043 (8th Cir.2007) (quoting *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 881 (8th Cir.2005)). Defendants dispute only the fourth element of the *prima facie* case.

Plaintiff argues the evidence in the summary judgment record establishes the fourth element in two ways. First, she relies on the statements made by Ms. Mason during her interview with Ms. Easton to the effect that she believed Ms. Dock's mother was attempting to rally the African–American employees against her as indicating fear on Ms. Mason's part that African–American employees were out to get her. This in turn motivated Ms. Mason to misrepresent what had occurred in

4. Iowa courts have analyzed claims under the Iowa Civil Rights Act by applying the federal framework for Title VII cases. *Hannoon v. Fawn Eng'g Corp.*, 324 F.3d 1041, 1046 (8th Cir.2003) (citing *Iowa State Fairgrounds Sec.*

*v. Iowa Civil Rights Comm'n*, 322 N.W.2d 293, 296 (Iowa 1982)). Accordingly, the Court has combined analysis of plaintiff's state and federal claims.

her office. Second, Ms. Dock argues evidence four white employees received a lesser sanction for similar conduct is sufficient to establish the fourth element. (*Id.*) The Court will start with the claimed similarly situated employees.

■■■ At the *prima facie* stage of analysis the Eighth Circuit applies a less burdensome standard for "similar conduct." *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 852 (8th Cir.2005). Plaintiff need only show that she and the comparators "were 'involved in or accused of the same or similar conduct and [were] disciplined in different ways.'" *Id.* (quoting *Wheeler v. Aventis Pharms.*, 360 F.3d 853, 857 (8th Cir.2004)). The Court will discuss the four compared employees in greater detail later at the pretext stage. They were given comparatively minimal punishment (reprimand and brief suspensions) but only one engaged in arguably abusive conduct directed at an employee (Ms. Mason), and that was objectively less severe. *See, infra* at 1242 (Employee A). The alleged more favorable treatment of the compared white employees would not alone support the *prima facie* case. However, this evidence taken together with (1) Ms. Dock's twenty-year history of satisfactory service without reported disciplines; (2) the fact Mr. Willyard was unaware of any District employees who had previously been terminated for insubordination or abusive conduct toward a supervisor (Def. App. at 100, 102); and (3) the contradictory evidence about what occurred in Ms. Mason's office and Ms. Mason's statement to Ms. Easton arguably indicating concern her dispute with Ms. Dock was aligning African–American employees against her is enough to satisfy the minimal evidentiary burden of the *prima facie* case.

■■■ Defendants have articulated a legitimate, nondiscriminatory reason for the termination of Ms. Dock's employment— her insubordination and abusive conduct toward Ms. Mason which created a hostile work environment. That takes the analysis to the pretext stage. As evidence of pretext Ms. Dock argues (1) the District failed to follow its policies in disciplining her; (2) the four white employees she compares herself to received lesser sanctions for the same or similar conduct; (3) she was in fact not insubordinate nor was she abusive to or act threateningly toward Ms. Mason; and (4) the "cat's paw" rule applies to make a triable case. The last two of these points are related. The Court will take each in turn.

## A. Similarly Situated Employees

■■■ Analysis of whether employees are "similarly situated" at the pretext stage is more "rigorous." *Rodgers,* 417 F.3d at 853. Plaintiff must show "the employees outside of her protected group were similarly situated [to her] in all relevant respects." *Id.*; *King v. Hardesty,* 517 F.3d 1049, 1063 (8th Cir.2008) (employees are "similarly situated" when involved in or accused of same offense and disciplined in different ways); *Phillips v. Union Pac. R. Co.,* 216 F.3d 703, 706 (8th Cir.2000)(compared parties must be similarly situated in all relevant respects). The Court will refer to the four employees to whom plaintiff compares herself as employees A, B, C and D.[5] In assessing the similarity of the four employees' situations, it is important to bear in mind that the neutral reason given for Ms. Dock's termination was not insubordination alone, but insubordination in combination with behavior in an abusive manner toward Ms. Mason which created a hostile work environment. The intense, aggressive, threatening, and hostile nature of the confrontation in Ms. Mason's office was the reason

5. There is a protective order in effect with respect to personnel records in this case.

given by Mr. Willyard and Ms. Woods for terminating Ms. Dock rather than giving a lesser discipline. A fair reading of Ms. Easton's report and findings together with the District policy definition of what conduct creates a hostile work environment indicates what occurred in Ms. Mason's office was the primary basis for Ms. Easton's hostile work environment finding. (*See* Def. App. at 37–38, 42).

Employee A was a white female bus driver who was disciplined for using inappropriate language when she told Ms. Mason she would come over and "p*ss in her truck." (Pl. App. at 97, 119). The statement was made from across a parking lot. (Def. Supp. App. at 3). A written reprimand was placed in the employee's file. (Pl. App. at 120).[6] This single statement, which does not appear to have been made in proximity to Ms. Mason or have been physically threatening, was not like the abuse charged against Ms. Dock.

Employee B, a white male, was disciplined with a three-day suspension without pay after he refused to participate in an investigation. (Pl. App. at 71). Ms. Frith was given the same discipline for failing to participate in the investigation involving the incident between Ms. Mason and Ms. Dock. (Def. App. at 2). Nothing in the record contradicts Mr. Willyard's assertion in his affidavit that a three-day suspension is a typical discipline for failing to cooperate in an investigation. Employee B did not engage in abusive conduct like that given as the reason for terminating Ms. Dock.

Employee C, a white male, was alleged to have used the "N" word. He was suspended initially, but after further investi-

gation the charge was determined to have been unfounded. The circumstances of the alleged use of the offensive language are not described in the summary judgment record with the result that if the incident occurred, the Court is unable to make an assessment of similarity. (Pl. App. at 99).

Employee D, a white male, was given a three-day suspension for using the "N" word. He had been telling a story about something that had happened in high school in which he described the use of the racial slur by someone else. (Pl. App. at 72; Def. Supp. App. at 3). The offensive language was not directed to, nor did it concern another employee; it was part of a story. Later employee D was terminated for creating a hostile work environment when he directed an ethnic slur at a co-employee. (Pl. App. at 72).

The conduct involving the four compared employees was not of comparable seriousness to that defendants contend was the reason for Ms. Dock's dismissal. *See Rodgers*, 417 F.3d at 853. The employees were not similarly situated to Ms. Dock in all relevant respects.[7]

### B. Progressive Discipline

▮▮▮▮ "Deviance from a progressive discipline policy can be evidence of pretext. . . ." *Morris v. City of Chillicothe*, 512 F.3d 1013, 1018 (8th Cir.2008); *see Arnold v. Nursing & Rehab. Ctr. at Good Shepherd*, 471 F.3d 843, 847 (8th Cir.2006). Ms. Dock argues the discipline provision in the union contract amounted to a progressive discipline policy which the District violated when it terminated her without

---

6. Employee A was later discharged for using a racial epithet on a school bus. (Pl. App. at 98).

7. None of the compared employees had the same job as Ms. Dock, (Def. Supp. App. at 3),

nor is it clear who their supervisors were or who was involved in the disciplinary decisions. The Court would need this information to make the more rigorous similarity evaluation required at the pretext stage.

intermediate discipline. The provision plainly does not require progressive discipline prior to termination. It lists four kinds of discipline (oral and written reprimand, suspension and discharge) which may be given depending on the seriousness of the offense. While the provision makes the common sense statement that less serious offenses "do not usually require immediate dismissal" it expressly informs employees they can be immediately discharged for serious offenses "without prior warning or attempts at remedial action." (Pl. App. at 2–3). Where, as here, the employer's policies provide that the employer may fire an employee without warning, the failure to pursue progressive discipline is not persuasive evidence of pretext. *See, e.g., Morris,* 512 F.3d at 1020; *Rodgers,* 417 F.3d at 854; *Smith v. Allen Health Systems, Inc.,* 302 F.3d 827, 835 (8th Cir.2002). The District did not fail to follow its own policies in discharging Ms. Dock.

### C. False Reasons

There is substantial evidence in the summary judgment record to support the reason given for Ms. Dock's termination. If Ms. Mason is believed, Ms. Dock's termination was fully warranted. On a motion for summary judgment, however, faced with different versions in the evidence about what occurred, the Court must accept the version favorable to Ms. Dock and cannot make credibility determinations. Viewed in this light, Ms. Mason overheard Ms. Dock complaining to Mr. Carter about the District's treatment of bus garage employees. Ms. Mason approached Dock, Carter and the other two employees present and three times asked Ms. Dock to come to her office. Ms. Dock was resistant, but when Ms. Mason gave an express directive, complied taking union representative Frith with her. Once in the office Ms. Dock and Ms. Mason argued about what had been said in the dispatch area, Ms. Dock's attitude toward her job, and Ms. Mason's complaints about how Ms. Dock had acted toward her. Both Ms. Dock and Ms. Mason raised their voices, but there was no yelling or screaming. Ms. Dock did not lean into or intrude upon Ms. Mason's personal space, or point her finger in Ms. Mason's face. Ms. Dock stayed on the other side of the desk and did not get inappropriately close to Ms. Mason. Overall, giving Ms. Dock the benefit of the favorable view of the record to which she is entitled, Ms. Dock's behavior toward Ms. Mason was not abusive or threatening and did not create a hostile work environment as defined in the District's policy. Moreover, the differences in the parties' versions are such that acceptance of that favorable to Ms. Dock permits a reasonable inference that in her statements to Mr. Willyard and to Ms. Easton, Ms. Mason exaggerated what had occurred.

Disbelieving Ms. Mason and the witness statements which support her version of events is not enough to establish pretext for race discrimination. "[T]he showing of pretext requires more than merely discrediting an employer's asserted reasoning for terminating an employee." *Johnson,* 422 F.3d at 763 (citing *Kohrt v. MidAm. Energy Co.,* 364 F.3d 894, 898 (8th Cir.2004)); *see Roeben v. BG Excelsior Ltd. Partnership,* 545 F.3d 639, 643 (8th Cir.2008) (citing *Johnson* ). The critical question under typical *McDonnell Douglas* analysis is whether the ultimate decisionmakers, Mr. Willyard and Ms. Wood, honestly believed Ms. Dock had been insubordinate and abusive to the extent of creating a hostile work environment. *Richey v. City of Independence,* 540 F.3d 779, 784 (8th Cir.2008); *Montes v. Greater Twin Cities Youth Symphonies,* 540 F.3d 852, 858 (8th Cir.2008) (citing *Johnson* ). Even if they did not, the evi-

dence overall must be sufficient for the trier of fact to reach the ultimate conclusion that race was a motivating factor in Ms. Dock's discharge. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 146–48, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); 42 U.S.C. § 2000e–2(m).

Ms. Easton made a thorough investigation in which she talked to numerous witnesses. In making her findings it is evident she accepted Ms. Mason's version of events. What occurred in the office was very much a "she said, she said" situation with some witness corroboration for Ms. Mason. In addition to what he had been told by Ms. Mason and Mr. Weiss, Mr. Willyard relied on Ms. Easton's findings in recommending termination as did Ms. Woods in acting on his recommendation. There is no evidence in the summary judgment record which impeaches the honesty of the conclusions reached by Easton, Willyard or Woods, or that Ms. Dock's race was a factor in their decisions.

### D. Cat's Paw

■ If Ms. Easton, Mr. Willyard and Ms. Woods were innocent of discriminatory intent, Ms. Dock argues Ms. Mason was not and her alleged bias infected the ultimate decision—the "cat's paw" argument.

This circuit's "cat's paw" rule provides that "an employer cannot shield itself from liability for unlawful termination by using a purportedly independent person or committee as the decisionmaker where the decision maker merely serves as the conduit, vehicle, or rubber stamp by which another achieves his or her unlawful design." *Dedmon v. Staley,* 315 F.3d 948, 949 n. 2 (8th Cir.2003). Where a decisionmaker makes an independent determination as to whether an employee should be terminated and does not serve as a mere conduit for anoth-

er's discriminatory motives, the "cat's paw" theory fails.

*Richardson v. Sugg,* 448 F.3d 1046, 1060 (8th Cir.2006)(citing *Lacks v. Ferguson Reorganized Sch. Dist. R–2,* 147 F.3d 718, 725 (8th Cir.1998)). The Tenth Circuit has said that what it refers to as "subordinate bias cases" have perhaps "suffered from an abundance of vivid metaphors." *E.E.O.C. v. BCI Coca–Cola Co.,* 450 F.3d 476, 488 (10th Cir.2006).

Stripped of their metaphors, subordinate bias claims simply recognize that many companies separate the decisionmaking from the investigation and reporting functions, and that racial bias can taint any of those functions. We see no reason to limit subordinate bias liability to situations that closely resemble the "cat's paw," "rubber stamp," "conduit," "vehicle," or other metaphors that imaginative lawyers and judges have developed to describe such claims.

*Id.*

■ "Cat's paw" or "subordinate bias" claims are founded on the related principles of agency and causation. The Eighth Circuit has recognized the application of agency principles in Title VII cases. *Kramer v. Logan County Sch. Dist. No. R–1,* 157 F.3d 620, 624 (8th Cir.1998). In a "cat's paw" case the bias of the subordinate is imputed to the ultimate decisionmaker and hence the employer. *See Laxton v. Gap, Inc.,* 333 F.3d 572, 584 (5th Cir.2003). The employer, however, is insulated from liability for the actions of a biased subordinate if the decisionmaker makes an independent determination that the employee should be terminated. *Richardson,* 448 F.3d at 1060. In *Richardson* and *Lacks* the Eighth Circuit concluded the evidence clearly indicated the decisionmaker had made an independent determination, breaking the causal connection to any bias by which others involved in the

process may have been motivated. 448 F.3d at 1046, 147 F.3d at 725. On the other hand, in *Kramer* the Eighth Circuit held the issue involved a credibility determination for the jury. 157 F.3d at 624. The same result obtained in *Kientzy v. McDonnell Douglas Corp.*, 990 F.2d 1051, 1056–60 (8th Cir.1993).

Recently in *Coe v. Northern Pipe Products, Inc.*, 589 F.Supp.2d 1055 (N.D.Iowa 2008), Judge Bennett in the Northern District surveyed the appellate case law in the Eighth Circuit and elsewhere in an effort to resolve the question "of the extent of the influence an allegedly biased subordinate must exercise over a purportedly independent decisionmaker who took adverse employment action against a plaintiff" to impose liability on the employer under a "cat's paw" theory. *Id.* at 1086. Judge Bennett "for the most part" agreed with the Tenth Circuit's holding in *BCI Coca–Cola, id.* at 1091, which was:

> To prevail on a subordinate bias claim, a plaintiff must establish more than mere "influence" or "input" in the decisionmaking process. Rather, the issue is whether the biased subordinate's discriminatory reports, recommendation, or other actions caused the adverse employment action.

450 F.3d at 487. Judge Bennett also agreed with the Tenth Circuit that it is not necessary for a plaintiff to show that the allegedly biased subordinate made an express recommendation that the plaintiff be subjected to the adverse employment action. *Coe,* 589 F.Supp.2d at 1091. The Tenth Circuit viewed a cat's paw limitation to a subordinate's explicit termination recommendation as running counter to the agency principles incorporated in Title VII which "would leave employees unprotected so long as a subordinate stopped short of mouthing the words 'you should fire him. . . .'" 450 F.3d at 488.

Where Judge Bennett parted company with the Tenth Circuit was that part of the Tenth Circuit's reasoning that an independent investigation by the employer cuts the causal link. *Coe,* 589 F.Supp.2d at 1092; *see BCI Coca–Cola,* 450 F.3d at 488. He believed the focus should be on causation rather than whether the employer conducted an "independent" investigation because "the ultimate adverse employment decision could still be tainted by a biased subordinate's information, participation or recommendation," permitting a "mixed motive" or "because of" discrimination claim in appropriate circumstances notwithstanding an independent investigation. *Coe,* 589 F.Supp.2d at 1092. Judge Bennett concluded "that if a material question of fact is generated on whether the biased 'cat's paw' information influenced an adverse employment action, even where an 'independent investigation' was done, it is for the trier of fact to decide whether causation existed." *Id.* at 1093.

This Court agrees with Judge Bennett's thorough analysis. The Tenth Circuit's general standard and Judge Bennett's rejection of an independent investigation as a *per se* break in the causal chain, are not inconsistent with Eighth Circuit case law. Concerning the latter, in both *Richardson* and *Lacks* the Eighth Circuit framed the causation issue in terms of whether the decisionmaker(s) made an independent determination to terminate the employee. 448 F.3d at 1060, 147 F.3d at 725. In *Kramer* the Eighth Circuit rejected the argument that a school board's independent fact-finding hearing was conclusive, finding in substance it was for the jury to determine whether the process amounted to an independent determination. 157 F.3d at 624; *see id.* at 627 (Arnold, R.S., J., concurring, rejecting "any general rule that a fair hearing before an impartial board immunizes a school district from the consequences of discrimination on the part

of the district's administration, if that discrimination is a proximate cause of adverse employment action.").

In this case to make out a triable issue on her "cat's paw" claim, Ms. Dock must present sufficient evidence to demonstrate a genuine factual issue on three elements: (1) Ms. Mason misrepresented what occurred between she and Ms. Dock in her office on March 2, 2006; (2) Ms. Dock's race was a reason for the misrepresentation; and (3) the information provided by Ms. Mason was a cause of the termination decision made by Mr. Willyard and Ms. Woods.

The Court has previously concluded that if the evidence supporting Ms. Dock's version of events is believed, there is a genuine issue about whether Ms. Mason misrepresented the circumstances and seriousness of what had occurred in her office, falsely presenting the incident as threatening and abusive when it was not.

Ms. Dock's argument that her race was a reason for Ms. Mason's alleged misrepresentation is twofold. She argues Ms. Mason's behavior toward her became hostile when she believed Ms. Dock had dated her previous boyfriend, Kevin Brown, who was African–American. It is not reasonable to infer from the fact this alleged attitude change occurred after Ms. Mason learned they had dated the same African–American man twenty-five years before that Ms. Dock's race was a factor in Ms. Mason's hostility. Such an inference does not pass beyond the realm of speculation.

Ms. Dock is on firmer ground when it comes to Ms. Mason's statement to Ms. Easton about her belief that Ms. Dock's mother was attempting to rally African–American employees against her, telling African–American employees they needed to stick together. Regardless of the truth of the information reported to Ms. Mason about the activities of Ms. Dock's mother, Ms. Mason's statement arguably betrays a concern on her part that the dispute with Ms. Dock had taken on racial overtones in which African–American employees were being pitted against her with a potential discrimination complaint in the offing. Ms. Mason felt the need to raise the subject with Ms. Easton, and to stress not once, but twice that Ms. Dock's troubles had nothing to do with race. The mere fact race was on Ms. Mason's mind as she gave her version of the incident to Ms. Easton "is not the same thing as acting because of race." *Lacks,* 147 F.3d at 725. If, however, the jury believes Ms. Mason falsely reported the incident with Ms. Dock, she must have had some reason for doing so. Viewing the record favorably to Ms. Dock as the Court is required to do, it would not be beyond reason for the jury to conclude Ms. Mason acted in the hope of securing the dismissal of Ms. Dock because Ms. Mason believed Ms. Dock's continued presence had the potential to align African–American employees against her and in this way Ms. Dock's race played a part in Ms. Mason's actions.[8]

There is evidence that what Ms. Mason had to say about the incident with Ms. Dock on March 2, 2006 influenced the decision to terminate Ms. Dock. In making her key hostile work environment finding Ms. Easton appears to have accepted Ms. Mason's description of what had occurred in the office. Mr. Willyard and Ms. Woods in turn relied on Ms. Easton's report. In addition, Ms. Mason at the outset had given Mr. Willyard her version of events

---

**8.** There is no evidence Ms. Mason harbored a general bias against African–Americans. Ms. Mason's long-term domestic relationship with an African–American man is against any class-based animosity. Title VII, however, does not require proof of animosity toward a person because of their protected status, only that race, color, religion, sex or national origin be a motivating factor in the adverse employment action. 42 U.S.C. § 2000e–2(m).

on the basis of which he ordered an investigation, and Mr. Willyard talked with Ms. Mason in determining what discipline to recommend. It follows that whether the influence of the allegedly tainted information from Ms. Mason was a cause of the ultimate termination decision is a disputed factual issue on this record. Stated otherwise, whether Mr. Willyard and Ms. Woods made a truly independent determination to terminate Ms. Dock, as in *Kramer, supra,* involves credibility determinations which the Court cannot make on a motion for summary judgment.

The Court thus concludes there are genuine issues of material fact with respect to each of the elements of Ms. Dock's cat's paw theory of racial discrimination and, it follows, the motion for summary judgment on her race discrimination claims must be denied.

## IV.

### RULING AND ORDER

Defendants' motion for summary judgment [21] is **granted in part and denied in part.** It is granted with respect to plaintiff's federal and state gender discrimination claims and said claims are dismissed. It is denied with respect to plaintiff's federal and state race discrimination claims.

IT IS SO ORDERED.